Argued July 1; affirmed September 20; rehearing denied November 15, 1932

## TAYLOR ET AL. *v.* WAIT ET AL.

(14 P. (2d) 283)

*Geo. Black, Jr.,* and *Harrison G. Platt,* both of Portland (Platt, Platt, Fales, Smith & Black, of Portland, on the brief), for appellant.

*Custer E. Ross* and *John H. Carson,* both of Salem, for respondents.

BELT, J. This is a suit for specific performance of a contract to make a will, and to impress a trust on the residue of the property of the estate of George J. Moore, deceased. It is alleged in the complaint that, on or about March 15, 1906, George J. Moore and his wife, Rebecca A. Moore, entered into an agreement to make mutual and reciprocal wills providing for the ultimate disposition of their respective properties in favor of the plaintiffs. It is averred that, pursuant to this agreement, George J. Moore, on March 22, 1906, executed his will wherein he gave and bequeathed all of his property to his wife, providing in the event of her death during his lifetime that it should then become the absolute property of Grace Rebecca Taylor, Clara Holton Lewis, and Alice Holton, the plaintiffs herein, share and share alike. This will was executed in the office of A. O. Condit, attorney at law, in the city of Salem, Oregon. John Moir and F. W. Spence subscribed their names thereto as attesting witnesses. The will of Rebecca was also prepared by Mr. Condit and it was executed by her in the presence of W. H. Scott and C. E. Nash at her home on the farm about 12 miles distant from Salem. The will, which is dated March —, 1906, provides, in effect, that her husband shall have a life estate in all of her property and, upon his death, it shall become the absolute property of her three nieces, Grace Rebecca Taylor, Clara Holton Lewis, and Alice Holton, share and share alike. Rebecca also provided in her will that, in the event of the death of her husband before her decease, her property should go absolutely and forever to the three nieces above named. Prior to the execution of the wills, on March 17, 1906, Moore and his wife executed deeds, each in favor of the other, purporting to convey about 226 acres of land. The deed from Rebecca

was not recorded by Moore until June 2, 1908, some months after her death which occurred on September 4, 1907. It appears from the testimony of W. S. McClain, who prepared these deeds and acted as notary in their acknowledgment, that Mr. and Mrs. Moore told him that they were exchanging deeds to save probate expenses in the event of death. Plaintiffs contend that these deeds were testamentary in character and were made pursuant to the agreement making them the ultimate beneficiaries under the wills.

After Mr. and Mrs. Moore had executed their wills the instruments were returned to the office of their lawyer, Mr. Condit of Salem, placed in separate envelopes, and kept among the files of his office until the commencement of this suit in 1930. Mr. Condit died March 22, 1925, but the wills were produced by Mr. Ronald Glover who carried on the practice of law in the same office.

On April 27, 1906, by a codicil to his will, Moore bequeathed to A. O. Condit the sum of $5,000. It was provided, however, that, in the event of the testator's death before that of his wife, the said sum of money should be kept on interest during the lifetime of his wife and the income therefrom used for her support and maintenance.

On March 20, 1909, Moore executed a will devising and bequeathing all of his property, real and personal, to the same three nieces, share and share alike.

George Moore died in Clackamas county, Oregon, on October 16, 1930, and there was filed in the probate court for such county an instrument purporting to be his last will and testament, executed on July 19, 1930. In this will the defendant John Edward Barry was made the sole beneficiary of the residue of Moore's

estate and was named as executor to serve without bond. After an order was entered admitting the will to probate, Ennis D. Wait and his wife, Alice B. Wait, filed in the same court an instrument purporting to be the last will and testament of George J. Moore dated August 28, 1930. On December 12, 1930, an order was made admitting to probate the last named will and revoking that made in reference to the will in favor of Barry. Thereupon Barry challenged the validity of what might be known as the Wait will and the court, after hearing, decided that the date thereof had been forged and that, in truth and in fact, it was executed in 1927. After the Barry will was reinstated the plaintiffs instituted this suit in Marion county for specific performance.

It is the theory of the plaintiffs that Rebecca Moore made her will, giving to her husband a life estate in her property, in consideration of his promise to execute a will making her nieces the ultimate beneficiaries of his property as above stated; that the wife complied with the agreement upon her part in that she never revoked her will; that Moore accepted the benefits under the will of his wife and, by reason thereof, equity will compel the observence of the contract by impressing a trust upon the property belonging to Moore's estate, in favor of the plaintiffs. The defendant Barry, the only defendant who has appealed, asserts that the wills made in 1906 were not made in consideration of each other nor pursuant to any contract, but were separate and independent instruments which could be revoked at any time.

From a decree in favor of the plaintiffs, as prayed for in their complaint, the defendant Barry appeals.

■ The decision of this case hinges primarily upon questions of fact. Did Moore and his wife enter into

an agreement, express or implied, to make reciprocal wills and to name the plaintiffs as the ultimate beneficiaries of the residue of their respective estates? Did Moore accept the benefits of his wife's will made pursuant to such agreement? Is it equitable and fair that such contract be enforced? That such agreements, if established by clear and convincing evidence, will be enforced is a rule well settled in this jurisdiction as elsewhere: *Stevens v. Myers,* 91 Or. 114 (177 P. 37, 2 A. L. R. 1155); *Holman v. Lutz,* 132 Or. 185 (282 P. 241, 284 P. 825); *Schramm v. Burkhart,* 137 Or. 208 (2 P. (2d) 14); *Tate v. Emery,* 139 Or. 214 (9 P. (2d) 136). Also see cases collated in notes to 2 A. L. R. 1200, 33 A. L. R. 739, and 73 A. L. R. 1397.

The cases are legion involving contracts to devise and bequeath property. They may be generally grouped or classified as follows: (1) Cases wherein the wills themselves disclose a contract or agreement to make certain disposition of property. In this class of cases the wills refer to each other and generally contain a recital that each will is made in consideration of the other. (2) Cases in which the claimants assert an agreement whereby certain services of a peculiar and personal nature were rendered in consideration of a promise to devise or bequeath property. (3) Cases where the wills themselves do not refer to each other or disclose any contract, but which are nevertheless taken into consideration, together with all of the facts and circumstances surrounding their execution, in determining the existence of an alleged contract. The cause of the plaintiffs, if any exists, comes within the last named classification.

The mere fact, in itself, that a husband and wife have made mutual and reciprocal wills does not neces-

sarily establish that they acted pursuant to any agreement. Mutual love and affection may well cause a husband and wife thus to dispose of their respective properties. It does not follow, however, that, because the wills in themselves do not show a contract, they will be excluded from consideration in determining whether in fact they were executed pursuant to a contract: *In re Burke's Estate,* 66 Or. 252 (134 P. 11); Page on Wills (2d Ed.) § 118. It is elementary that a will not made pursuant to an agreement is revocable. It is likewise well established that if A enters into an agreement with B to make certain disposition of his property by will in consideration of B's promise to make a will, and, after complying with his part of the contract, A dies relying upon such promise, B, who has accepted the benefits of such an agreement, will not be permitted to rescind. Equity will enforce the agreement by impressing a trust upon the property of B's estate in favor of those for whom the contract was made. A promise to make a will is consideration for a promise to make a will in return: Page on Wills (2d Ed.) § 93, citing in support of the text numerous authorities among which is *Stevens v. Myers* (Or.), supra.

As each case depends upon its own peculiar facts, we see no reason to analyze or review the authorities, particularly since this has been done in *Stevens v. Myers,* supra, and *Holman v. Lutz,* supra. Counsel disagree, not so much on the law as on the facts of the case.

It has been a difficult and laborious task to review the voluminous record in this case, including as it does over a hundred documentary exhibits. In this opinion we shall endeavor to discuss only those salient facts

which we deem controlling, although, through the ability and industry of counsel, every possible angle of the case has been directed to our attention.

We pass to the question as to whether plaintiffs have established, by clear and convincing evidence, the contract as alleged in the complaint. Moore and his wife, who were about sixty years of age when their wills were executed in 1906, had no children. The only known relative of George Moore was his brother Robert against whom they had become very bitter as a result of litigation. George Moore was determined that his brother should never inherit a cent of his property. The record discloses beyond doubt that George Moore had lost confidence in his fellow men. This is illustrated by the statement in one of his many letters to Grace, "The world is getting so there is no honesty— but scheming and trickery." He was born in Belfast, Ireland, and came to this country when a young man. As a result of the protection and blessings which a beneficent government bestowed upon him, he was, enabled to accumulate considerable property, yet we find him writing over and over again that this is a rotten country from top to bottom. He had no confidence in courts or lawyers, yet he was constantly appealing to them in defense of some property right. In his opinion, all office holders were crooks and grafters. He was miserly, self-centered, and unscrupulous. He juggled his property about to defeat his creditors and to avoid payment of court costs. Such is the character of the man who is charged with having broken faith with his wife and breached his contract.

Mrs. Moore, who was born in London, England, was a frail little woman. She had been crippled in her youth as a result of a lightning stroke. In her later years she was obliged to go about in a wheel chair.

Her life on the farm was lonesome as there were few of her neighbors in whom she was interested. Serving and caring for her husband seemed to be her principal mission in life. Her letters—extending over a period of years—to her brother's wife and daughters indicate clearly her strong affection for them and her feeling for the ties of kinship. Her sad life was brought to an end when she was murdered on her wedding anniversary, by having her throat cut and her skull crushed. The murderer was never apprehended.

■ It is beyond cavil that Mr. Moore and his wife had knowledge of each others wills and that the naming of the three plaintiffs as the ultimate beneficiaries was the result of their common understanding and purpose. Mr. Scott testified that, at the time Rebecca Moore executed her will she stated to him, in effect, that she and her husband were "willing to one another." Later she told Nash about her nieces in New York, stating that they were to receive her estate after she was through with it. Soon after the execution of the will, Mrs. Moore, in a conversation with Mrs. Scott relative to the promise of George Moore to repair their house, said, "I guess I will use my own money and fix up the house. It will be all right any way. When I am done with it he will get it any way and when he is through with it I want it to go to my nieces." On June 10, 1906, Mrs. Moore wrote to Grace Rebecca Taylor in part as follows:

"Now Grace I have made a will. The man lives in Salem, Oregon that holds it. His name is A. O. Condit. If I should die before your Uncle George my property will go to him but at his death I will have it go to my brother's three daughters Grace R. Taylor, Clara Holton Lewis and Alice Holton, share and share alike, to be divided after all expenses are paid. You had better keep this."

On July 13, 1906, she again wrote to Grace as follows:

"Now Geo. has made a will, all to me but if I die first it is his but after that it goes to you girls. Robert will never get a cent if we can help it."

On November 12, 1907, two months after the death of his wife, Mr. Moore wrote to Grace Taylor,

"* * * Rebecca and I made our wills conveying to you three girls all what is left share alike after we got through with it so if I should take heart failure or die suddenly you will know how to proceed by writing to A. O. Condit, Salem, Oregon. He is our attorney."

This letter strongly indicates Moore's sense of obligation to carry out the desires of his wife. This conclusion is further strengthened by the fact that, in the following month, namely December 21, 1907, Moore sent to Grace Rebecca Taylor a certificate as follows:

"To Whom It May Concern:

This is to Certify that I, Geo. J. Moore, acknowledge Grace Rebecca Taylor living at present at 742 Mc-Donough St., Brooklyn and Clara Mary Holton Lewis and Alice Holton, all of Brooklyn, N. Y., them to be the nieces of my wife, Rebecca Holton Moore and legatees in a certain will at the decease of the testators share & share alike.             George J. Moore,
Jefferson, Oregon."

A letter to Grace in January, 1908, reads in part as follows:

"* * * Now to let you know how we came to make our wills. My brother tried to put me out of this place. I bought the place & give him a half interest, in the first place 27 years ago. A few years ago he sold it without letting me know, so I had to buy him out. Then he went away & after a while he wrote to me & asked me if I would let him into one of the houses & I told him yes, so he stayed here about three years &

then he sued me for 500 dollars, took advantage of the fact that he was on the place to claim wages & the courts would give it to him, as the courts hold that you would not have men around except you wanted them, so I paid him & then to prevent him ever from getting any more we made our wills. Each one to the other & you three girls to get it all, so he could not get any thing & won't get anything. He (my brother) never wrote or came here since. He lives about 50 miles from here. I will get all the property by degrees in the Bank in New York so you won't have any trouble when I get through.''

In January, 1908, he sent to the two other nieces certificates similar in form to that which he had mailed to Grace Taylor, reciting that they were named as beneficiaries ''in *a certain will* made by her Aunt Rebecca A. Moore & her husband George J. Moore.'' (Italics ours.) After Moore executed his will in 1909, wherein he gave and devised all of his property to the three nieces, share and share alike, he wrote to Grace Taylor on March 22, 1909, as follows:

''*   *   * I have made a new will & send it with this. All the difference is that the Executor of *the will Rebecca & I made* was, Condit, a lawyer in Salem, 12 miles from here, as it would have required some one out here to sell the land, & now as the land is sold it won't need him & saves quite a bit of money for you three girls.'' (Italics ours.)

On October 26, 1909, he again wrote to her as follows:

''*   *   * Anyhow everything is all right now in case anything happens to me as Rebecca wanted it to go to you and I had no one here that I could trust.''

Mr. James Duncan, who lived near the Moore home and in whom Mr. Moore seemed to have confidence, testified that Moore told him that he and his wife ''had

made an agreement with each other whichever one died first the money or property would revert to the one that was left. * * *"

After careful consideration of the entire record, we are convinced that the wills made by Moore and his wife in 1906 were the result of an agreement and that one was made in consideration of the other. It is immaterial that there is no direct evidence that the wills were to be irrevocable. Such would be implied. Each of these parties had a substantial amount of property, the exact amount of which is uncertain. Suffice it to say, we think the wife was induced to make her will giving him a life estate in her property in reliance upon his agreement that he also would designate her nieces as the ultimate beneficiaries of their respective properties. Moore breached his contract when he made a later will giving to Barry—a man whom he had known for only a few months and who had never seen Rebecca Moore—the entire residue of his estate, valued at between $50,000 and $70,000. The equity and justice of the case are with the plaintiffs.

■ The statute of frauds has no application. Moore accepted the benefits of his wife's will. The small balance in her bank account was transferred to him, although her estate was never probated. Other property belonging to her unquestionably came into his hands. Moore, at that time, was apparently acting under and pursuant to the terms of his contract.

The decree of the lower court is affirmed.

ROSSMAN, KELLY and CAMPBELL, JJ., not sitting.