Argued November 21, 1957, affirmed January 29, 1958

# IRWIN *v.* FIRST NATIONAL BANK OF PORT-LAND AND PATE ET AL

### 321 P. 2d 299

*W. C. Winslow,* Salem, argued the cause for appellants. With him on the brief were John Wm. Stortz and John H. Carson, Salem.

*Laurence L. Morley* and *M. Maurice Orona,* Lebanon, argued the cause for respondent Natheel Irwin. On the brief were Morley and Thomas, Lebanon, and Weatherford and Thompson, Albany.

Before PERRY, C. J. and ROSSMAN, BRAND and McALLISTER, Justices.

McALLISTER, J.

This is a suit for specific performance of a contract to make a will. The plaintiff is Natheel Irwin, the stepdaughter of the decedent, Frank C. Pate. The defendants include the widow of said decedent, the First National Bank of Portland (Oregon), as administrator of his estate, and three sisters and the children of two deceased brothers of said Frank C. Pate, who are the heirs at law of said decedent. The widow, who because of an antenuptial agreement claims no interest in the estate, did not appear and an order of default was entered against her. From a decree in favor of plaintiff, the said heirs of Frank C. Pate, who will be referred to herein as the defendants, appeal.

We will briefly relate the facts which resulted in this controversy. The decedent, Frank C. Pate, and Belle Pate were married in 1911 and thereafter lived in Albany. Belle had been previously married and had a daughter, Natheel, then 10 years of age, who was raised in the Pate home until her marriage in 1923. Frank Pate, who had no children of his own, apparently always treated Natheel with fatherly affection as if she were his own daughter.

Within a few years after his marriage, Frank Pate acquired a creamery in Albany which he operated until it was sold in 1943. His wife, Belle, worked in the office of the creamery during most of this period. In a letter written after Belle's death, Frank stated that his wife "had worked in the business at all times the business was operated" and that "we actually operated as a partnership."

In addition to helping her husband run the creamery, Belle made other contributions to the family estate. In about March, 1940, Belle received about $17,300

from the estate of her sister. $10,000 of this sum was invested in securities registered in the name of Belle and her daughter, Natheel, as joint tenants with the right of survivorship. Although these securities were held by Natheel, the income therefrom, averaging about $60 per month, was paid to Belle during her lifetime. Of the remainder of this inheritance, $2,000 was paid by Belle to her brother and the balance of about $5,300 was added to the funds jointly held by Belle and her husband or used to pay the balance of a debt owing by them. The income received by Belle from the securities apparently was also used to supplement the Pate income. There is evidence of other contributions by Belle to the family estate but since that evidence is not definite and in any event does not affect the disposition of this case, it is not necessary to discuss it further.

Title to the real property on which the creamery was located had been held by Frank Pate, but in April, 1940, Frank conveyed a one-half interest in this property to his wife by a deed which expressed his intention to create an estate in entirety. It will be noted that this conveyance was made at about the time Belle contributed the $5,300 to the family funds.

In October, 1943, the Pates sold their creamery, including the real property, for $21,500 under a contract providing for a down-payment of $2,000 and the balance to be paid in monthly installments of $100 with interest, also payable monthly. After the sale of the creamery the Pates planned a trip to California to visit Natheel and her family, but before leaving Albany, executed the wills involved in this case.

It is clearly established that the Pates told their attorney that they had agreed that the survivor should have the use and benefit of all their property during

his or her lifetime and that upon the death of the survivor, all the property then remaining should pass to Natheel. Their attorney at first intended to draw a separate instrument to evidence this agreement. After further consideration, he decided that a separate instrument was unnecessary and that it would be sufficient to refer to the agreement by appropriate recitals in the wills. The two wills were dictated by the attorney in the presence of both Mr. and Mrs. Pate and were executed the following day, December 1, 1949, at the bank in Albany.

Belle Pate's will contained the following provisions:

"SECOND: That in as much as all real property which I now own or have an interest in is owned by husband Frank C. Pate and myself as tenants by the entirety and each of us desires to provide for the desposition (sic) of our property and have this date executed, reciprocal identical wills.

"THIRD: I therefore give, devise and bequeath unto my said husband, Frank C. Pate, for his natural life all real and personal property of every kind and nature whatsoever and wheresoever situated, to use and manage the same during his life time and upon his death I give, devise and bequeath the remainder thereof unto my daughter Natheel Irwin. * * *"

The will of Frank C. Pate contained the following provisions:

"SECOND: That whereas my wife, Belle Pate has this date executed a reciprocal will and whereas the real property belonging to me and in which I have an interest is vested in myself and my said wife as tenants by the entirety and whereas our personal property in which I have an interest is held by us with rights of survivorship and whereas my said wife and I have agreed as to the manner in which our property and the property of either

of us should be disposed of, I therefore in performance of this agreement between my said wife and myself, give, devise, and bequeath unto my said wife, Belle Pate, during her natural life, all real and personal property of which I die, seise, and possessed as stated, giving and granting unto my said wife the power to manage and control the same so long as she may live as though the same were her property and upon the death of my said wife I give, devise, and bequeath the remainder thereof unto by step-daughter, Natheel Irwin. * * *"

Belle Pate died in April, 1944. Her will was admitted to probate in Linn county on May 16, 1944, and Frank Pate was appointed executor of her estate. The probate was completed and the estate closed on April 10, 1946.

On November 16, 1946, Frank Pate married Mabel Beauchamp. As stated above, an antenuptial agreement was executed by these parties whereby each waived all right in the estate of the other. In accord with that agreement, the widow has asserted no claim or interest in the estate of Frank Pate.

This subsequent marriage resulted in the revocation of the will of Frank Pate by operation of law[1] and he neither republished the old will nor made a new one. Frank Pate died intestate on September 18, 1952. His estate was admitted to probate in Linn county and defendant bank was appointed administrator of the estate. Thereafter plaintiff filed this suit for specific performance of the agreement between Frank Pate and her mother and for a decree requiring the bank to turn over to the plaintiff the entire balance of the estate of Frank Pate after paying the costs of administration.

[1] ORS 114.130. A will made by any person is deemed revoked by his or her subsequent marriage * * *.

■ Before considering the contentions of the defendants, we will briefly state the applicable rules of law. From *Ankeny v. Lieuallen,* 169 Or 206, 218, 113 P2d 1113, 127 P2d 735, we take the following:

"The doctrine that where, pursuant to a contract, a husband and wife, or any two persons, make mutual or reciprocal wills, each making a testamentary disposition in favor of the other, the making of one being a consideration for the making of the other, the wills are valid, and, unless revoked during their joint lives, the will of the survivor becomes irrevocable after the death of the other if the survivor takes advantage of the provisions made by the other, and that the courts will not permit the survivor, if the rights of any third party would be injuriously affected thereby, to violate the mutual agreement, is well established by the following decisions of this court: Stevens v. Myers, 91 Or. 114, 177 P. 37, 2 A. L. R. 1155; Schramm v. Burkhart, 137 Or. 208, 2 P. (2d) 14; Tate v. Emery, 139 Or. 214, 9 P. (2d) 136; Taylor v. Wait, 140 Or. 680, 14 P. (2d) 283; Lay v. Proctor, 147 Or. 545, 34 P. (2d) 331; Cooke v. King, 154 Or. 261, 61 P. (2d) 429, 107 A. L. R. 881."

■ The above quotation states the rule accurately except for that portion which says that "the will of the survivor becomes irrevocable," which portion was probably not meant literally. This court has frequently held that a will may be revoked by the survivor even though made in compliance with a contract. But such revocation will not impair or circumvent the enforcement of the contract. This distinction was clearly pointed out in the early case of *In re Burke's Estate,* 66 Or 252, 256, 134 P 11, and has been restated in the recent case of *Florey et al. v. Meeker et al.,* 194 Or 257, 277, 240 P2d 1177, as follows:

"It is worthy of note that the law is well established in this jurisdiction that a testator to a joint

will may make a different testamentary disposition at any time and that this right applies notwithstanding that the joint and mutual will was made pursuant to contract and can even be accomplished after the decease of his cotestator. Branchflower et al. v. Massey, 187 Or 40, 47, 208 P2d 341; Van Vlack et al. v. Van Vlack, 181 Or 646, 668, 182 P2d 969, 185 P2d 575; In re Burke's Estate, 66 Or 252, 256, 134 P 11; 4 Page, Law of Wills (3d ed.) 833, § 1709. An essential characteristic of every will, whether a joint or individual will, is that it remains ambulatory during the testator's lifetime. 68 CJ, Wills, 602, § 223. In the Van Vlack case, we said at page 668: '* * * a contract to make a will, when based upon sufficient consideration, is irrevocable, although the will which was executed pursuant to it remains revocable.' It, therefore, follows that if the revocation or modification on the part of one testator is of a character that works a breach of the terms of the original contract, any party in interest who suffers thereby has a remedy in a suit on the breached contract. Van Vlack et al. v. Van Vlack, supra, at page 666."

■ An accurate statement of the rule governing mutual wills is contained in *Schramm v. Burkhart,* 137 Or 208, 215, 2 P2d 14, as follows:

"* * * It is established law that if two parties verbally agree, each in consideration of the other doing likewise, to make their wills disposing of their property in a specified manner and one dies leaving a will which complies with the contract and the survivor accepts benefits under the will, non-compliance with the agreement by the survivor would operate as a fraud which a court of equity will prevent. In such case the acts done by the other in compliance with the agreement is such a part performance as would take the case out of the statute of frauds and equity will compel the fulfillment of the contract: In re Burke's Estate, 66 Or. 252 (134 P. 11). This rule of law is so well settled that further citation is unnecessary."

Defendants concede that Frank and Belle Pate worked out a mutually satisfactory "testamentary plan," but contend that such plan did not amount to a binding contract. On the contrary, we think that the existence of such a contract is established by clear and convincing evidence. It is hardly necessary to go beyond the language of the will. When Frank Pate declared in his will that "my wife and I have agreed as to the manner in which our property and the property of either of us should be disposed of," and that "I therefore in performance of this agreement between my said wife and myself, give, devise, and bequeath," we think he meant exactly what he said. The language is clear, simple and unambiguous. In view of this solemn declaration, and the circumstances under which it was made, we are convinced that these mutual wills containing reciprocal provisions were executed in compliance with an agreement for the disposition of their property, entered into after due consideration by Belle and Frank Pate. We will not enlarge this opinion by discussing the other testimony which also amply supports the conclusion herein reached.

■ It is contended by defendants that the Pates owned all of their property as tenants by the entirety or jointly with a right of survivorship and that Frank Pate received no benefit from Belle's will. The record does not support this contention. The inventory in Belle's estate lists as personal property her interest in three promissory notes and the contract for the sale of the creamery. Although the inventory contained the statement that all of said property was held by Frank and Belle Pate with a right of survivorship, the evidence is to the contrary. The original contract for the sale of the creamery is in evidence and contains no words creating a right of survivorship in

the deferred payments. See *Manning v. U. S. Nat. Bank,* 174 Or 118, 148 P2d 255. The notes are not in evidence and we are unable to tell whether they were held by the Pates with a right of survivorship. However, the file of the probate court in Belle's estate which is in evidence contains an assignment executed by Frank Pate, as executor, assigning to himself individually the interest of the estate in the contract for the sale of the creamery and one of the three notes.

It is not necessary to decide in this case whether a husband and wife who sell real property owned by them as tenants by the entirety under a contract of sale hold the contract and the right to receive the deferred installments as tenants by the entirety. We note that the legislature, by Oregon Laws 1957, ch 402, p 558, has attempted to overrule the decisions of this court which would seem to require a different conclusion. See *Stout v. Van Zante,* 109 Or 430, 219 P 804, 220 P 414 and *Re Estate of Denning,* 112 Or 621, 229 P 912.

■ In this case the contract for the sale of the creamery included in addition to the real property all machinery, equipment, three motor vehicles and other personal property used in connection with the business, and the good will of the business. The purchase price is not allocated but it is obvious that a substantial portion thereof was paid for the personal property. The value of Belle's interest in the contract was appraised at $9,500 and the note at $750. Even if we assume that some portion of the creamery contract attributable to the real property was held with the right of survivorship, there was still ample benefit received by Frank Pate by virtue of Belle's will to obligate him

to perform the contract to make a will. See *Taylor v. Wait,* 140 Or 680, 14 P2d 283.

We wish to point out, however, that there is no substantial evidence in this case that Frank Pate ever entertained any thought of violating the agreement entered into with Belle. In the absence of evidence to the contrary, the conclusion is obvious that he entered into the antenuptial agreement before his marriage to Mabel Beauchamp so that his ability to leave his property to Natheel would be unimpaired by said marriage. After his marriage to Mabel, Frank bought a house and lot in Albany adjoining a similar property owned by his wife. His widow testified that Frank told her that the house and lot "was to be mine someday." It is significant, however, that Frank took title to this property in his own name which was consistent with an intention to perform his agreement with Belle. After Belle's death Frank named Natheel as the beneficiary of his life insurance with her son as the contingent beneficiary.

The ties of fatherly affection between Frank Pate and his stepdaughter were apparently unaffected by Belle's death. Frank continued to visit Natheel in California from time to time and on one or more of said visits was accompanied by his second wife. There is no evidence of any change in the friendly relationship between father and stepdaughter during this period.

The record is silent as to why Frank Pate did not make a new will after his marriage to Mabel Beauchamp. His conduct indicates that he was a man of integrity and we prefer to think that he was unaware that his will was revoked by his second marriage. In any event, having made the agreement with Belle and accepted the benefit thereof, he was obligated to per-

form the agreement on his part. There is no substantial evidence that Pate had any intention to do otherwise.

The defendants also contend that Frank Pate was released from his obligation under the contract by a settlement made with Natheel after Belle's death. This contention is based on the testimony of the widow and of two of the decedent's sisters regarding statements made to them by Frank Pate. The statements as related were ambiguous and in the absence of anything more substantial, this contention does not merit serious consideration.

■ Lastly, the defendants contend that Belle breached her agreement with Frank by failing to take from her daughter the jointly owned securities referred to above and transfer them to a joint ownership with Frank. Nothing is offered to show that Belle, having made a gift to Natheel of an interest in these securities, had any right to divest her daughter of that interest. In any event, we think this contention is without merit. The evidence indicates that Frank was fully informed about the securities when he executed his will and there is not the slightest evidence that the will was executed in consideration of a promise to transfer to him any interest in the securities. *Prime v. Prime,* 172 Or 34, 139 P2d 550, cited by defendants, is not in point. In that case the principal consideration for the execution of the agreement by the wife was the promise of the husband to transfer certain life insurance to the joint estate which he failed to do. No similar circumstance is shown here.

We approve the disposition of this case made by the court below and affirm the decree. Neither party shall recover costs in this court.