Argued March 9, affirmed March 23, 1960

# WILLIAMS *v.* CHASTAIN ET AL

350 P. 2d 430

*Eugene E. Feltz,* Portland, argued the cause for appellant. On the brief were Jacob, Jones & Brown, Portland.

*C. X. Bollenback,* Portland, argued the cause for respondents. With him on the brief was Eugene C. Libby, Portland.

Before MCALLISTER, Chief Justice, and WARNER, SLOAN and HOLMAN, Justices.

HOLMAN, J. (Pro Tempore)

The plaintiff David Gorton Williams brought this suit to impress a trust on all of the assets of the estate of Charles R. Layton. The defendants are the executor of Layton's estate, Huse Chastain, and the beneficiaries under his last will and testament, Ellen Greene and George L. Greene, who were, respectively, the sister and nephew of decedent. The principal asset of the estate was a note in the approximate sum of $10,000 signed by plaintiff and secured by mortgages on a home in Laurelhurst Addition in Portland and its contents.

Plaintiff and decedent had become acquainted around 1940 while plaintiff worked as a hair stylist and decedent as a credit manager for the Bedell Com-

pany in Portland. Shortly thereafter, they took an apartment together. After a short term in the Army by decedent, they continued to live together and eventually in 1944 they purchased the home in Laurelhurst in their joint names and moved into it, together with plaintiff's mother and father. Plaintiff's mother was seriously ill and died shortly thereafter but plaintiff's father continued to live there, as long as plaintiff and decedent occupied the premises, with one absence of about a year. Plaintiff and decedent lived together until 1953, when they had a disagreement and decedent moved out and plaintiff and his father remained.

Immediately after taking up their abode together, they commenced acquiring household effects among which were many antiques and reproductions which were apparently quite valuable. During the latter part of their relationship the contents of the home were appraised for fire insurance purposes in the approximate amount of $40,000, though there is no indication that anything like this amount was paid for them. They paid $11,500 for the home but it was mortgaged to the extent of some $9,000. They pooled and commingled their earnings and from time to time had a joint bank account. In November of 1945, they drew wills in which, except for small bequests to relatives, they left their estates to each other and in case of death of both through a common accident, their estates were to be divided equally between two of plaintiff's and two of decedent's relatives.

The pertinent part of decedent's will was as follows:

"IV

"I give, devise and bequeath unto my good friend and life-long companion, DAVID GORTON WILLIAMS, all of the rest, residue and remainder of my estate, real, personal and mixed, wheresoever

situate, of which I may die seized or possessed or to which I may be entitled at the time of my decease.

"V

"* * * My reason for this Will is to make sure that the property being accumulated by my life-long friend, David Gorton Williams, and me, is left to him in the event of my death or divided among our mutual heirs in the event we should meet our demise at one and the same time. Because of this common interest we enjoy in the home we own together and the many pieces of art we have collected therein, this Will is being made so that we each may be sure to enjoy the fruits together in line with the mutual Wills we have made and so that the survivor may have the use of our estate for his lifetime and dispose of it as he sees fit."

The plaintiff's will was identical in these respects with decedent's except the decedent was the beneficiary.

At the same time, the parties executed an agreement concerning their wills which was as follows:

"THIS AGREEMENT made this 6th day of November, 1945, by and between DAVID GORTON WILLIAMS, Party of the First Part, and CHARLES R. LAYTON, Party of the Second Part.

"— W I T N E S S E T H: —

"THAT, WHEREAS, the Party of the First Part and the Party of the Second Part have this day each made Wills leaving their jointly held property to each other, and

"WHEREAS, it is the desire of both the First Party and the Second Party that the other party take all of their jointly held estate in the event of either's death.

"IT IS THEREFORE AGREED, that in the event either party desires to revoke or destroy his will, he will not do so without full consent and agreement of the other.

"NOW, THEREFORE, in consideration of each having made his Will as stated above and of this agreement and execution thereof, we have devised and bequeath all of our property to each other and in consideration of such devise and bequest in the event of each other's death, we hereby agree that if either of us desire to change our Wills, we shall notify the other party by a registered letter."

Plaintiff's and decedent's relationship was apparently a stormy one at times. The record indicates there were a series of disagreements, sometimes somewhat violent, and several times decedent moved from the premises but they would subsequently make up and decedent would return. In 1953 they had a final parting and decedent moved out and did not return.

After decedent's removal in 1953 from the home, he executed a new will on April 9, 1954, revoking the will in favor of plaintiff and leaving all of his property to the defendants Greene, his sister and nephew. There is no evidence that he notified plaintiff of his plans to revoke his will. Thereafter, on April 20, 1954, decedent sold his interest in their joint property, both real and personal, to plaintiff for the sum of $10,000 payable at $50 per month without interest. He gave a bill of sale and deed to the plaintiff and took back mortgages on both the real and personal property to secure payment of the money. Decedent died on November 7, 1955. Plaintiff introduced his will in favor of decedent into evidence and testified it was still in effect, had never been revoked, and that he had no notice until after decedent's death that decedent had revoked his will in favor of plaintiff. Plaintiff now

brings this suit to impress a trust on the assets of decedent's estate, claiming he had an enforceable contract with decedent requiring decedent to leave all of his property to him.

Defendants have three principal contentions in defense. First defendants contend that the wills and contract when construed together result in an ambiguity because it is not clear whether plaintiff and decedent intended that all of their property should go to the other or just their joint property, and that if all the facts and circumstances concerning the relationship of the parties and the documents themselves are construed together it was the intention of the parties that the wills should only act upon their joint property. There being no joint property at the time of death, they claim there was nothing for the will to act upon.

Second, defendants also contend that a contract to keep mutual wills in effect can be revoked by either except where one party has accepted property by the will of the other who has predeceased him.

Third, defendants contend the contract and the wills were the result of undue influence practiced by plaintiff upon decedent.

The first point of inquiry concerns whether plaintiff and decedent had a contract concerning only their jointly held property or all of their property. There can be no doubt from recitations in the written instruments and the testimony of the witnesses that there was a contract between them for mutual wills.

■ Many loose comments concerning the irrevocability of mutual wills have resulted in the cases and legal treatises from the failure to distinguish between contracts to make wills and the wills themselves and the rules applicable to each. See *Ankeny v. Lieuallen,* 169

Or 206, 216, 113 P2d 1113, 127 P2d 735; and *Estate of Engle,* 129 Or 77, 82, 276 P 270, as illustrations of this. Contract rules have been applied to wills and the law of wills to contracts with much resultant confusion. There is no such thing as an irrevocable will. This has now been made clear by the subsequent cases of *Irwin v. First Nat'l Bank,* 212 Or 534, 321 P2d 299; and *Van Vlack et al. v. Van Vlack,* 181 Or 646, 665, 182 P2d 969, 185 P2d 575, which have returned to the rule laid down in *In re Burke's Estate* 66 Or 252, 256, 134 P 11. Also see Gardner on Wills (2d ed) ch IV, p 64, § 19. In the case of *Irwin v. First Nat'l Bank,* supra, Mr. Justice McALLISTER speaking for the Court stated as follows at page 540:

> "The above quotation states the rule accurately except for that portion which says that 'the will of the survivor becomes irrevocable,' which portion was probably not meant literally. This court has frequently held that a will may be revoked by the survivor even though made in compliance with a contract. But such revocation will not impair or circumvent the enforcement of the contract."

There is a statement concerning the same matter by Professor Sparks of New York University in his book "Contracts To Make Wills," New York University Press, 1956, p 110:

> "Although it is elementary contract law that one party cannot, in the absence of a breach by the other, rescind his obligation without incurring liability for his failure to perform, there is much discussion both in the cases and among the commentators of the promisor's right to rescind a contract to make a will. And although it is an elementary principle of testamentary law that a will is by its very nature freely revocable and ambulatory until the death of the testator, there is much discussion of the irrevocability of a will that has been

executed in compliance with a contract. Neither of these concepts has any foundation in principle nor is either of them supported by more than very meager authority. They both result from an evident failure to distinguish the effect of a will from the rights and duties created by contract. Thus, while the overwhelming weight of authority reaches the logical, and what seems to be the inevitable, conclusion that the contract is irrevocable except by mutual consent of both parties to it and that the will is always revocable so long as the testator is alive and *sui juris,* the confusion still prevails among the commentators and in judicial dicta."

Because of the view we take of defendants' first contention, we are not passing upon defendants' second contention that there is a unilateral right to revoke a contract to make mutual wills unless the party attempting to revoke has already accepted the fruits of the bargain upon the death of the other party. The Oregon court has apparently not been faced with the specific question of whether mutual promises to make wills are adequate consideration for each other so that one party may not thereafter void the contract by unilateral action.

■ A person coming into court to assert his rights in a case such as this is attempting, as the plaintiff is, to take not under the will but under the contract. The decedent revoked his mutual will in this case and he had a right to do so. His new will is perfectly valid and not subject to be set aside. By executing a new will and revoking the mutual will he may have breached his contract with plaintiff, thus making his assets at death subject to enforcement of the contract, but this has no bearing upon his power to revoke his will. Therefore, it is of primary importance to determine the exact contract that was entered into between de-

cedent and plaintiff. The wills are merely the means by which a contract for mutual wills is carried into effect.

The evidence shows that the written contract and wills were entered into simultaneously, though the contract speaks in the past tense when referring to the wills:

> "* * * have this day each made wills * * *."

Actually, the written contract appears to be for the purpose of an agreement as to revocability though it contains recitations of the purpose of the parties in making their contract for mutual wills. It does not appear in itself to be a contract to make wills, but rather a written memorandum of the contract the parties did make. It is particularly important to try to determine whether it was the intention of the parties to will to each other all of their property or just their joint property. In this connection, it would appear that its recitations are ambiguous in that it contains three recitations concerning joint property as follows:

> "THAT, WHEREAS, the Party of the First Part and the Party of the Second Part have this day each made wills leaving their jointly held property to each other, * * *

> "WHEREAS, it is the desire of both the First Party and the Second Party that the other party take all of their jointly held estate in the event of either's death,
> "* * * * *

> "NOW, THEREFORE, in consideration of each having made his Will as stated above * * *."
> (Referring to the first recitation above.)

while it contains one recitation concerning all of their property:

> "* * * we have devised and bequeath all of

our property to each other and in consideration of such devise and bequest in the event of each other's death, we hereby agree  \*   \*   \*."

■ The testimony of Garthe Brown, the attorney who drew the instruments for the parties, concerning the circumstances was as follows:

"Q. How did it happen that you prepared these documents?

"A. Well, my best recollection of how these documents were prepared was that Mr. Layton contacted me some period of time prior to the date they bear and told me that they wished wills made out, and told me the terms of them, and that they also wanted an agreement between themselves that they would not change their wills so that whoever survived would have the benefit of what they had accumulated together.  \*   \*   \*"

Again he testified:

"Q. Mr. Brown, do you know the—Did they, either Mr. Williams or Mr. Layton disclose to you the reason why they wanted these wills?

"A. Yes, they stated that they had bought this home and property together. At that time they had a debt on it and were working together to pay the debt and living together to minimize expenses, and they felt that whoever survived should have the benefit of what they worked on together. That was at least the explanation I was given."

The plaintiff himself also testified as follows:

"Q. Why did you enter into these—this will and this agreement with Mr. Layton?

"A Well, Charles thought it was best because of the fact that we had accumulated these things together that there should be some assurance that in case of the death of either one of us—we had pooled our expenses, we had a joint bank account at that time, I believe, and we pooled our expenses.

And therefore he believed it was necessary to have these wills, and I agreed with him."

It would also be proper to take into consideration any statements made in their wills in determining the parties' contract. By this we do not mean that the wills are the contract, but they can be considered as evidentiary matter in determining the intent of the parties with reference to the contract. Decedent's will had in it an outright devise and bequest to plaintiff of all decedent's property but it also contains the following statement of the reason the will was made:

"* * * My reason for this Will is to make sure that the property being accumulated by my life-long friend, David Gorton Williams, and me, is left to him in the event of my death or divided among our mutual heirs in the event we should meet our demise at one and the same time. Because of this common interest we enjoy in the home we own together and the many pieces of art we have collected therein, this Will is being made so that we each may be sure to enjoy the fruits together in line with the mutual Wills we have made and so that the survivor may have the use of our estate for his lifetime and dispose of it as he sees fit."

This recitation in the will is in itself ambiguous.

■ It would appear to us from the above statements of intention, both in the will and in the contract, and from the oral testimony of the witnesses, that the contract covered only jointly held property. Their concern seemed to be disposition of the things they jointly acquired. The wills which were executed by the parties as a result of the agreement purported to leave all of their property to each other but this is not necessarily inconsistent with an agreement to leave only joint property. They could and did go further than their contract required and leave all of their

property to each other, but plaintiff in this case cannot complain that decedent subsequently withdrew, without his consent, that which he was not obligated to give in the first place, to wit, property other than joint property. There being no joint property in existence at the time of the death of decedent, there was no property concerning which they had contracted. As a result, plaintiff was not and could not have been damaged by decedent's revocation of his will.

In view of the foregoing determination that the contract between the parties covered only jointly held property, it is unnecessary for us to consider whether any undue influence was exercised by the plaintiff upon the decedent as a result of their rather unusual relationship.

The decree of the trial court is affirmed.