688 P.2d 1342 (1984)
69 Or.App. 16
In the matter of the Estate of Matilda Kottmeier, Deceased.
Patricia SCHAAD, Appellant,
v.
Carl LORENZ As Personal Representative of the Estate of Matilda Kottmeier, Deceased, Respondent.
Patricia Schaad, Hilmer Finne and Eva Maxey, Appellants-Cross-Respondents,
v.
Carl Lorenz As Personal Representative of the Estate of Matilda Kottmeier, Deceased. Delores Lorenz, Karen Lorenz, David C. Lorenz, Kathy Jo Lorenz, Teresa Platts, John Platts, Barbara Luhrs and Christine Eide, Respondents-Cross-Appellants.
135-822; CA A27894 Control; A8110-06070; CA A28158.
Court of Appeals of Oregon.
Argued and Submitted March 12, 1984.
Decided July 11, 1984.
*1344 Ferris F. Boothe, Portland, argued cause and filed briefs for appellants-cross-respondents.
Donald A. Bick, Eugene, argued cause for respondent-cross-respondent Carl Lorenz. With him on briefs were Janice M. Stewart, and McEwen, Hanna, Gisvold, Rankin & Van Koten, Portland, for remaining respondents-cross-appellants.
Before RICHARDSON, P.J., JOSEPH, C.J., and WARDEN, J.
JOSEPH, Chief Judge.
A.M. Kottmeier and Matilda Kottmeier, husband and wife, had no children. In 1946, when A.M. was 70 and Matilda 58, they executed a joint will, which states, in pertinent part:
"KNOW ALL MEN BY THESE PRESENTS, that we, A.M. Kottmeier and Matilda Kottmeier, husband and wife, both of sound mind and disposing memory, and desiring to make disposition *1345 of our property, do each mutually in consideration of our mutual agreement with each other and of the provisions made herein in each others behalf, make this our Last Will and Testament and agree that the same cannot be changed nor varied by either without the consent in writing of the other, hereby revoking all previous wills by either of us made.
"FIRST: All of our property held by us jointly, both real and personal, at the time of the death of either of us shall be held by the survivor during his or her lifetime, the survivor to have the use and benefits thereof and rents and profits arising therefrom during the period of his or her natural life, and it is accordingly by us so bequeathed and devised to the survivor of us during the period of the survivor's natural life.
"SECOND: After the death of the survivor of us as aforesaid all property remaining unexpended and the rents and profits arising therefrom, and the rest, residue and remainder of all real, personal or mixed property that the survivor may die seized and possessed of is hereby given, devised and bequeathed as follows:
"One half thereof shall be divided share and share alike between the following heirs and devisees of A.M. Kottmeier:
"William H. Coffee, a nephew; Mary Finnie [sic], a niece; Ethel Reglan, a niece; Eva Maxey, a niece; Hilmer Finnie [sic], a nephew; Albert Coffee, a nephew, and Caroline R. McCormack, a sister-in-law;
and in the event that any of said persons shall not be living at the time of the death of the survivor of us under this will, the share which is herein devised to such person so deceased, shall be divided equally among the living devisees hereinabove named.
"The remining [sic] one-half thereof shall be divided between the following heirs and devisees of Matilda Kottmeier, share and share alike:
"Mary N. Lorenz, her mother; Caroline R. McCormack, a sister; John Lorenz, a brother; Carl H. Lorenz, a nephew; and Barbara Jean Lorenz, a niece; and in the event that Mary N. Lorenz and John Lorenz, or anyone of them, should be deceased at the time of the death of the survivor herein, then in that event the share of such deceased devisee shall be divided in equal proportion between Carl H. Lorenz and Barbara Jean Lorenz; and in the event that Caroline R. McCormach [sic] should be deceased at the time of the death of the survivor herein, then in that event the share that said Caroline R. McCormack would have received had she been living shall be divided equally between her two children:
"Warren H. Dobyns, Jr. and Patricia H. Shaad [sic]."
A.M. Kottmeier died in 1950, and the will was probated. In that proceeding all of A.M.'s property was considered to have been devised to Matilda. In 1972 Matilda executed another will making dispositions that are inconsistent with the dispositions in the 1946 will; she also made substantial inter vivos transfers that are also inconsistent with the 1946 scheme.[1] Matilda died in 1981 at the age of 93, after Caroline McCormack had died.
The plaintiffs, takers under the 1946 will, seek removal of defendant Carl Lorenz as personal representative of the estate of Matilda and also a declaratory judgment of their rights under the 1946 will. The trial court denied the petition for removal of the personal representative and found that a contract to make a will existed, under which Matilda could not disinherit Hilmer Finne and Eva Maxey, takers by A.M.'s will, but was free to disinherit Patricia Schaad. The trial court also found that inter vivos transfers of money and real property made by Matilda were subject to *1346 the provisions of the 1946 will and imposed a constructive trust on those assets.
The contractual language of the introductory paragraph of the will is clear and convincing evidence that the will was executed according to a contract between the parties. See Taylor v. Wait, 140 Or. 680, 684, 14 P.2d 283 (1932); Cook v. Walsh, 39 Or. App. 357, 591 P.2d 1201 (1979). Defendants argue, however, that, if a contract exists, it is contrary to public policy and therefore unenforceable. That is not the law in Oregon. Oregon has long recognized the right of parties to contract freely for the distribution of their property. After the death of one testator, if the survivor has benefitted, courts will enforce the contract. Florey, et al. v. Meeker, et al., 194 Or. 257, 240 P.2d 1177 (1952); Ankeny v. Lieuallen, 169 Or. 206, 113 P.2d 1113, 127 P.2d 735 (1942); Taylor v. Wait, supra. The fact that Matilda lived more than 30 years after executing the 1946 will does not alter her obligation to abide by the agreement that her husband died believing would be complied with.
We turn first to a consideration of whether Matilda was bound to devise part of her estate to Patricia Schaad. The trial court found that Matilda was free to change her testamentary dispositions, although she could not alter those of her husband. The difficulty results in no small part from the efforts by the testators each to devise one-half of their combined estates separately while keeping their property commingled. Defendants have urged that allowing Matilda to disinherit Patricia would effectuate the intention of each testator to dispose of an individual half of the estate as he or she wished. Defendants cite in support Florey, et al. v. Meeker, et al. supra. However, in Florey the testators reserved the right to substitute devisees; here, on the contrary, the testators specifically agreed that the provisions of the will could "not be changed or varied by either without the consent in writing of the other."
The only analogous case cited by either counsel is Brewer v. Simpson, 53 Cal.2d 567, 2 Cal. Rptr. 609, 349 P.2d 289 (1960). In Brewer, a husband and wife contracted that, after the death of the survivor of them, one-half of the estate would go to the heirs of the husband and one-half to the heirs of the wife. The surviving wife remarried and transferred to and mingled her assets with those of her second husband. Accepting the claims of the heirs of the wife (who was still alive at the time of trial), the court noted:
"Defendants argue that any promise of Abigail to leave one half the property to plaintiffs, her own kin, if she survived George, was only incidental to the main purpose of the contract, which was to make sure that if she survived George she would receive the entire estate, and if she did not survive him, her own relatives would receive one half the estate; therefore, defendants say, the contract was not `made expressly for the benefit' of plaintiffs (Civ.Code § 1559) and plaintiffs, as mere incidental beneficiaries, cannot enforce it. Acceptance of this argument would lead to peculiar conclusions. The will of Abigail and the will of George each set forth the gifts to the kindred of both in language which does not differentiate between the intent to benefit the testator's own kindred and the intent to benefit the kindred of the spouse. Yet Abigail would have us believe that she intended that her relatives should be the express beneficiaries of George's will if she predeceased George but only incidental beneficiaries of her will if she survived George. From this it would follow that George's will, listing the gifts to kindred of both spouses in the same straightforward manner as Abigail's, nevertheless is the vehicle of the same subtle differentiation of intent.
"On the other hand, the contract evidenced by the mutual wills is readily and reasonably susceptible of the trial court's view that it was `made for the express benefit of all the persons named therein *1347 as beneficiaries.'" Brewer v. Simpson, supra, 53 Cal.2d at 588, 2 Cal. Rptr. 609, 349 P.2d 289.
We find Brewer persuasive. Although Matilda was technically free to revoke her 1946 will, which she did, she was not free to repudiate the underlying contract. Irwin v. First Nat'l Bank, 212 Or. 534, 540, 321 P.2d 299 (1958). The result is admittedly peculiar in that A.M., who provided for Patricia's mother, Caroline McCormack, did not provide for a gift over to Caroline's children in the event that she should predecease him. Matilda did so provide. Why the testators chose to do that is unknowable. Be that as it may, the testators evidenced an understanding that they were binding themselves as well as each other by their agreement. As a third party beneficiary of the contract Patricia has the right to enforce its terms. See Irwin v. First Nat'l Bank, supra, and cases cited therein. The judgment of the trial court finding that Matilda was free to disinherit Patricia Schaad is reversed.
Patricia claims that she is entitled to a share of Matilda's half of the property by reason of her being the survivor of her mother, Caroline. Given our conclusion that Matilda could not disinherit Patricia, that is correct. She also claims that she is entitled to the share that her brother, Warren Dobyns, would have received had he survived their mother. Insofar as she claims to "inherit" from Warren, that is not correct, for Warren had to survive Caroline in order for any interest to vest in him in the event of Caroline's dying before Matilda. The trial court held:
"His having died without issue, prior to the death of the survivor of A.M. Kottmeier and Matilda Kottmeier, results in the gift having lapsed. ORS 112.395."
That is also not correct. In the first place, under Oregon Laws 1973, chapter 506, section 43(1), the version of ORS 112.395 as it existed at the time of the execution of the will in 1946, applies, and OCLA 18-604[2] by its terms did not apply in this situation. In the second place, before the application of the lapse statute can be reached, there is a question of construction to be answered. The effect of the 1946 will is clear with respect to the effects of the death of some of the named takers before the death of the survivor of A.M. and Matilda, but not as to Caroline. The issue is whether there is anything in the will, in the absence of an express declaration of intent, which will permit the inference of the testators' intention. In re Estate of McCoy, 193 Or. 1, 236 P.2d 311 (1951); Miller v. Smith, 179 Or. 214, 170 P.2d 583 (1946); Kaser v. Kaser, 68 Or. 153, 137 P. 187 (1913); Schmidt v. First National Bank, 31 Or. App. 455, 570 P.2d 981 (1977).
A.M.'s scheme of distribution is clear. In the event of the death of any of his heirs or devisees, the survivors would succeed to the deceased person's share. Under Matilda's plan, it is clear that she intended in the event of the death of her mother, Mary, or her brother, John, that her nephew, Carl, and her niece, Barbara, would succeed to those interests. Caroline's interest on the other hand was separately set aside from those of the other four, and we think a fair inference is that she intended Warren and Patricia, or whichever of them survived both Caroline and Matilda, to enjoy Caroline's share of the estate. We conclude that Patricia is entitled to the share of Matilda's half of the estate that Caroline would have received had she lived.
The trial court commented:
"It taxes credulity to say that as part of their bargain, A.M. Kottmeier demanded of Matilda Kottmeier that she promise him that she would give a share *1348 of her one-half to her sister's children, if her sister did not survive, when his gift to the same sister is conditioned on her survival."
We do not share that feeling. There is nothing particularly incredible about A.M.'s having intended Caroline to be one of his devisees, as well as one of Matilda's, if she survived them both. Certainly there is nothing in the record before us that makes that intention on his part highly unlikely. On the other hand, there is nothing startling about the idea that A.M. would rather have his own lineal nieces and nephews share in his part of the estate in the event of Caroline's death before the survivor in preference to her children and for Matilda to want to benefit her blood niece and nephew equally with her surviving close relatives, if Caroline were not to survive. This construction in favor of Patricia's enjoying her mother's share of Matilda's property not only avoids a lapse, but it is congruent with the entire dispositive scheme evidenced by the 1946 will.
Defendants argue that, if a contract exists, more than one class of property is created and only property jointly owned at the time of A.M.'s death is subject to the agreement. That is, any property separately owned by Matilda at that time or acquired by her after her husband's death could be used and disposed of by her as she wished. However, to adopt that reading of the will would result in the curious anomaly that any separately owned property of the deceased spouse would remain in limbo until the death of the survivor.[3] We do not believe that the testators intended that result. Rather, we believe that the testators intended that all of their property (whenever acquired) be subject to the agreement. This reading is consistent with the language of the will read in the light of the nature of the ownership of the couple's property.
About a year before executing the will, the Kottmeiers had sold their farm in Umatilla. At A.M.'s death four years later, his probated estate consisted mainly of notes payable jointly to him and his wife from the sale of the farm. His interests were submitted to probate.[4] There were also bonds in co-ownership, some of which had been in existence at the time of the execution of the will, which passed to Matilda as surviving owner without probate.
The property provisions of the 1946 will show that the testators understood that they had individual and joint ownership property. Furthermore, the assets then likely to compose the estate of the first to die were mainly interest bearing instruments which would be paid over a period of time to the survivor. Much  if not all  of the interest would come from assets accumulated jointly by the parties over the years.[5] The language of paragraph "SECOND" shows that the parties clearly recognized *1349 that those assets were to be included under the terms of the agreement, as well as any property of the survivor that might not be directly traceable to the original investments.
Matilda was not free to alienate property in order to defeat the terms of the agreement. See Annot., 85 ALR3d 59-63 (1978); Ankeny v. Lieuallen, supra; Peterson v. Woods, 48 Or. App. 675, 617 P.2d 915 (1980). She made over 30 inter vivos transfers of real and personal property. Defendants urge that there is insufficient evidence to show that those transfers were without consideration. We disagree. The record supports a finding that Matilda made them in an effort to avoid the consequences of her contract to make a will. On October 31, 1972, the same day that she executed her second will, she also signed the following statement:
"I, Tillie Kottmeier, admit that I have prepared this will of October 31, 1972, knowing that there may be a suit in equity after probate because of the contract aspect of the joint will with my deceased husband. I also have been advised that a trust or living gift may be available to me, but I have declined to consider doing that in order to avert the consequences of the contract aspect."[6]
The majority of the inter vivos transfers were made between 1972 and 1977.[7] The value of those transfers at Matilda's death was more than $170,000 from a total gross estate of $280,000. The depletion of her estate by those transfers was in contravention of her contract. As stated by Professor Sparks:
"It is clearly inequitable to permit one to contract to make a will leaving his entire estate to a named person at death and then defeat the effect of the will by making an inter-vivos gift of all his property, thus leaving nothing upon which his will made in compliance with the contract can operate. Such a transfer, if the property is still in the hands of a volunteer, is ineffective so far as defeating the contractual rights is concerned. The same result is reached where the inter-vivos transfer consists of, not all, but a substantial portion of the promisor's estate." Sparks, Contracts to Make Wills 58 (1956). (Emphasis supplied.)
The trial judge was correct in finding that property held by defendants, none of whom took without notice, by virtue of the inter vivos transfers from Matilda should be held in constructive trust for distribution according to the terms of the 1946 will.[8] However, the assets which passed to Tracie Stout and James Stout, neither of whom is a party to this proceeding, are not subject to the constructive trust, and the judgment requiring them to surrender those assets is void.
Defendants urge finally that plaintiffs' claims for relief were not commenced within the Statute of Limitations. The limitation period for a contract to make a will begins to run on the death of the testator whose actions are challenged. See Lewis v. Siegman, 135 Or. 660, 665, 296 P. 51, reh'g den. 135 Or. 660, 667, 297 P. 1118 (1931); see also Schomp, et al. v. Brown, et al, 215 Or. 714, 335 P.2d 847, reh'g denied 215 Or. 723, 337 P.2d 358 (1959); Ellinwood and Ellinwood, 59 Or. App. 536, 651 P.2d 190, rev. den. 294 Or. 460, 658 P.2d 1162 (1982). Plaintiffs brought these actions within the statutory limit.
*1350 We do not find persuasive defendants' argument that laches should apply. The bringing of these actions by plaintiffs after the death of Matilda did not result in prejudice to her. She had bound herself contractually to a testamentary disposition of her property and was aware of the difficulties that her later will faced. She chose not to seek in her lifetime to set the contract aside. Neither do we find prejudice to the grantees of the duplex by reason of their having expended time and care in maintaining it. The record of the conservatorship of Matilda shows payment for labor and services rendered in maintaining the real property and does not show any unreimbursed services claimed by the grantees.
Plaintiffs have assigned as error the failure of the trial court to award attorney fees and cite as authority our decision in Jones v. Kuhn, 59 Or. App. 135, 140, 650 P.2d 999, rev. den. 294 Or. 149, 655 P.2d 179 (1982):
"Plaintiffs request attorney fees. Although the general rule is that attorney fees cannot be awarded unless provided by statute or contract, they may be awarded to a party who, at his own expense and not for his sole benefit, successfully brings suit to benefit an estate or trust as a whole. State Land Board v. Sovenko, et al, 202 Or 571, 574-76, 277 P2d 781 (1954). In order for the prevailing party to recover attorney fees, the suit must have resulted in an increase in the estate or trust assets. McCormick v. Rand, 246 Or. 606, 425 P.2d 488 (1967)."
Plaintiffs have met the requirements for an award of fees from the estate as a whole. Not only have they, as well as defendant Barbara Luhr, benefited by the action, but the value of the estate has been augmented by more than $150,000.[9]
Plaintiffs also contend that the court erred in failing to remove Carl Lorenz as personal representative of the estate of Matilda. The trial court found that the personal representative had not breached his fiduciary responsibility and that he did not have a conflict of interest which would preclude his acting in such capacity. "Probate courts are vested with large discretionary power in control of executors and administrators in the administration of estates, and appellate courts should not interfere unless there is a plain abuse of such discretion * * *." In re Faulkner's Estate, 156 Or. 23, 27, 65 P.2d 1045 (1937). Our review of the record does not show that the trial judge abused his discretion, given his determination of the case below. However, we suggest that on remand he reconsider the motion in the light of the quite different result under this decision.
Affirmed on CA A27894; affirmed in part; reversed in part; and remanded for modification of judgment not inconsistent with this opinion and for determination of attorney fees on CA A28158.
NOTES
[1] Between A.M.'s and Matilda's deaths the kind and quantity of the assets changed materially.
[2] OCLA 18-604 provided:

"When any estate shall be devised to any child, grandchild, or other relative of the testator, and such devisee shall die before the testator, leaving lineal descendants, such descendants shall take the estate, real and personal, as such devisee would have done in case he had survived the testator."
[3] The probate of A.M.'s estate passed more than $30,000 worth of assets to her as a life estate.
[4] In Stout v. Van Zante, 109 Or. 430, 219 P. 804, 220 P. 414 (1923), the Supreme Court held that notes payable jointly to a husband and wife to secure a mortgage on property which had been held by tenancy by the entirety did not create survivorship in the notes. The Stout rule did not change until the 1957 legislature enacted ORS 93.240.
[5] Although the record is not clear, Matilda apparently claimed during the probate of A.M.'s estate that $32,000 in bonds were purchased with her own money. However, the bonds were in co-ownership at A.M.'s death. That probate record also contains a seemingly contradictory affidavit by Matilda stating that she had no separate income:

"[Matilda] is not in good health and is unable to work and support herself and has not been able to do so for several years last past and has been dependent for her living upon the property accumulated by herself and A.M. Kottmeier, during his lifetime.
"That all of the property mentioned in said Inventory and Appraisement was accumulated by the said A.M. Kottmeier and Matilda Kottmeier through their joint efforts working together as husband and wife.
"That she is without independent means of supporting herself in the circumstances and conditions to which she has been accustomed * * *."
[6] This statement reinforces the conclusion that Matilda and A.M. executed the 1946 will according to a contract.
[7] A conservatorship was established for Matilda in April, 1977, on the basis that she was "unable without assistance to properly manage or take care of herself of [sic] her personal affairs."
[8] Defendants also argue that the inter vivos transfers were irrevocable and beyond the control of Matilda. The transfers were not outright gifts. Matilda retained a life estate in the duplex and joint ownership of the bonds and bank accounts. The inventory of the conservatorship shows that they were considered her assets, and they are not beyond the reach of the court to impose a constructive trust on them.
[9] Moreover, to the extent that the increased value of the estate will increase the amount distributable to defendant Carl Lorenz, he will benefit, even though several of the other defendants are relatives whom he wants to be able to keep the property Matilda transferred to them.