# JOHNSON, *Appellant,*
### *v.*
# WILSON et ux, *Respondents.*

554 P2d 157

*Clayton H. Morrison,* Portland, argued the cause for appellant. With him on the brief was Howard P. Arnest, Portland.

*Gary Roberts,* Legal Aid Service, Portland, argued

the cause and filed a brief for respondents.

Before O'Connell,* Chief Justice, and Holman, Tongue, and Bryson, Justices.

BRYSON, J.

*Chief Justice when the case was argued.

## BRYSON, J.

Plaintiff brought a forcible entry and detainer action against defendants to recover possession of residential property. The defendants filed a general denial and an affirmative equitable defense which alleged:

"[I]

"In the fall of 1956, plaintiff and defendants entered into an oral agreement which provided that defendants could remain in possession of the above-described premises during plaintiff's lifetime. Plaintiff further agreed that she would devise and bequeath the above-described premises in fee simple absolute to the defendants at the time of plaintiff's death. Said agreement further provided that defendants would pay plaintiff the sum of fifty dollars each month until the mortgage on the above-described premises became fully paid.

"[II]

"Further consideration for said agreement consists of the love, affection, friendship and sense of having a family which plaintiff desired and which defendants have continuously provided to plaintiff.

"[III]

"At all times material hereto, defendants have fully complied with said agreement and fully performed all of their obligations thereunder.

"* * * * *",

and prayed for a decree dismissing the complaint and "ordering the specific performance of Plaintiff's obligations under the oral agreement entered into with defendants."

Plaintiff's reply denied the allegations of defendants' affirmative equitable defense and asked for immediate restitution of the premises.

The case proceeded to trial on the equitable defense and the court entered a decree as follows:

"1) Plaintiff, BERTHA T. JOHNSON, has a life estate in the real property commonly described as 706 N.E. 76th, Portland, Oregon, and that upon plaintiff's

death, defendants shall receive a fee simple interest in the above described real property as tenants by the entirety; and

"2) The defendants shall remain in the premises and pay plaintiff the sum of $50.00 per month as long as plaintiff shall live. In addition, as an adjustment to the contract and reflecting the fact that defendants have not made some payments to plaintiff in recent years, defendants shall pay plaintiff the sum of $50.00 per month until a total of $2,750.00 is paid to plaintiff or untill [sic] plaintiff's death, whichever event first occurs; * * *" and

dismissed the action for forcible entry and detainer with prejudice.

The plaintiff appeals and contends the trial court erred in finding that there was sufficient evidence to establish an oral contract for plaintiff to devise her residential property to defendants. We review de novo.

Defendants and plaintiff met in 1953 when the defendants rented plaintiff's home then situated at 1314 N. E. 6th Avenue in Portland, Oregon. In November 1956 plaintiff sold the 6th Avenue residence and purchased a house in northeast Portland, into which defendants moved.

In addition to their original landlord-tenant relationship, the parties' backgrounds caused them to develop a close personal relationship. Plaintiff Mrs. Johnson was an orphan and had no family. The Wilsons were childless and wanted to adopt children. There is evidence that the Wilson family addressed plaintiff as "mother" and "grandmother."

The plaintiff testified:

"Q   What were the terms of the agreement with the Wilsons?

"A   Well, he would pay me $50 a month for the rent of the house, and I would pay Mr. Wilson — and pay for the material that it took to repair anything about the house, and also pay him for his labor, and that would come out of the rent.

"Q   Why did you have it rented for such a low price?

"A   They had adopted some children and I was an

[ 72 ]

orphan and knew what it meant to be an orphan, and I wasn't dependent upon what they paid me anyway, so I thought I was doing them a good deed by letting them have it as cheaply as possible."

Plaintiff paid $7,800 for the second house, which is the one involved in this litigation. She made a down payment with monthly payments of $75 per month. She also paid the taxes on the real property, which amounted to $377.95 for the tax year 1974-75 at a taxable value of $13,600. Plaintiff completed payment on the contract and received a deed to the property on September 17, 1969.

During the early part of 1975 plaintiff decided to sell the house which defendants had been occupying since 1956. She testified (deposition read into record):

"Question: Why did you decide to sell the house?

"Answer: Oh, well, I wasn't getting any use out of it and it caused me more trouble than anything else, and it hasn't given me any good benefits, so why hang onto it and just be involved in something else again, because I never thought this would come up, I thought everything was all taken care of and everything would just be all right, and then all this comes up, you see, someone was saying that she [defendant Lois Wilson] was telling someone that they were buying the house. Well, they had never discussed buying the house with me and there is no contract, and I had never set any price on the house, no agreement on how much payment I wanted a month or anything like that on the house. So this was all coming out of their brains."

Defendant Coston Wilson testified regarding the alleged oral agreement as follows:

"A  * * * So, she [plaintiff] purchased this house out on Northeast 76th and asked us would we live in the house if she bought it, and we agreed to.

"* * * * *.

"Q  What was your agreement at that time? What was your agreement about the house?

"A  Well, at that particular time when we first moved into the house, her agreement was we were to pay $50 a month rent for the house, and some time later on that she

[ 73 ]

and I were talking, and my wife, she said that some day this house would get to be ours, that she didn't have any family of her own and she would like to adopt us as her family and if something happened to her, you know, that the property would become ours.

"Q In return for that, did you talk about her staying with you or coming to live with you?

"A Yes, that had come up several times. She said when she retired from working, where she presently was working at that time, that she would come to live with us.

"* * * * *.

"Q [Counsel] What was talked about as to the length or duration of time you were to pay this $50?

"A Well, I was to pay her $50 until the place was paid for.

"* * * * *.

"Q Was the agreement that as soon as she made all the payments on the house it was to be yours at that time, or the house was to be yours after she died?

"A Well, the agreement was, 'The house is to be yours,' not after she died, because the contents stated we weren't to open this letter until after she died. She said, 'Not to be opened unless something happens to me.'

"Q Around that time did she specifically tell you when she died the house was to be yours?

"A Yes, yes she did."

On December 15, 1955, approximately one year before plaintiff purchased the premises involved in this litigation, plaintiff executed her "Last Will and Testament" which first provided for funeral and burial services and the payment of her debts. It then provided, "I give and bequeath and devise the residue of my estate in equal shares to my friends LOIS WILSON and COSTON WILSON, presently residing at 1413 NE 6th Avenue, Portland, Oregon, or to the survivor between them."

Mr. Wilson testified that Mrs. Johnson gave him an envelope with the will in it "about '57 or '58, somewhere along those years." He further testified:

"Q [Counsel] When Mrs. Johnson gave you that envelope, what did she say?

"A    She said this was the contents of her will, of the property to us, but we was to keep it and not open it until — unless something happens to her, and then we would go to Mr. Green with the envelope and open it in his presence, and he would explain the procedure to us.

"* * * * *.

"Q    What is written on the face of that envelope?
"A    'To be opened after my death.' "

The exhibits received show that plaintiff's will was not in the envelope marked, "To be opened after my death" but, rather, a letter stating:

"To Whom it may concern: —

"* * * My will is in safe of Atty. Howard P. Arnest's safe, office, 14th floor of Yeon Bldg."

The defendants did not call the defendant Lois Wilson as a witness. When called by the plaintiff, she testified:

"A    * * * What were the terms of the agreement?
"* * * * *.

"A    We were supposed to pay her $50 a month.

"Q    That was the terms?
"A    No, the rest was the house was to be ours one day.

"Q    Okay. After — when would the house be yours?
"A    I don't know because I don't know when she made the last payment.

"Q    In your deposition I asked, 'What would happen? She would deed it to you, the house, at that time?' And you answered, 'Yes.'

When you made this oral agreement, were any other parties present?
"A    Just the three of us.

"Q    Did you continue to make your $50 a month payments after 1972?
"A    No, I don't think so.

"Q    Did you make any payments in 1973?
"A    Yes.

"Q    How many?
"A    One.

"Q    Did you make any payments in 1974?
"A    Yes.

"Q That was the last year?

"A Yes.

"* * * * *.

"Q Now, late in December of 1974, did a Mr. Howard Arnest and Mrs. Johnson visit with you in your home?

"A In December, yes, I think so.

"Q At that time did Mr. Arnest tell you that Mrs. Johnson was going to sell the house?

"A No, Mom [plaintiff] told me herself.

"Q Isn't it a fact, at that time you asked how long before you had to leave?

"A I don't remember.

"Q What I am getting at, at that time did you bring up this oral contract?

"A No, I didn't. I did not."

On cross-examination she testified:

"Q Mrs. Wilson, why didn't you say anything about the agreement at the time Mr. Arnest came over?

"A I don't know. I was upset because I had no notice or anything. I didn't know what was happening."

Plaintiff, 87 years old at the time of trial and retired, had previously been employed by Mr. Allen Green for some 20 years as a housekeeper. She "lived in" with the Green family. She testified quite clearly on all matters except the recall of dates. Plaintiff also testified that when she had "trouble" with the defendants in selling her house she changed her will and made "[t]he man I worked for, Allen Green," the beneficiary of her estate.

An oral contract to make a will devising real property must be proved by clear, concise and convincing evidence. *Paulson v. Paulson,* 241 Or 88, 91, 404 P2d 199 (1965); *Gill v. Hewitt,* 244 Or 242, 244, 417 P2d 399 (1966). "[P]roof by 'clear and convincing evidence' means that the truth of the facts asserted is highly probable." *Cook v. Michael,* 214 Or 513, 527, 330 P2d 1026 (1958); *Sheets v. B & B Personnel Systems,* 257 Or 135, 145, 475 P2d 968 (1970). The agreement must be just and mutual in its obligations and there must be a strict performance of the promisee of all terms and conditions of the contract. *Losey v. O'Hair,* 160 Or 63, 73, 83 P2d 493 (1938).

■  Generally, in a suit on an oral contract for specific performance, a meeting of minds upon each and all essential elements is indispensable to creation of a contractual relationship. *Friesen v. Fuiten,* 257 Or 221, 229, 478 P2d 372 (1970); *Kretz et ux v. Howard et al,* 220 Or 73, 346 P2d 93 (1960).

In most, if not all, of the numerous Oregon cases involving an oral contract to make a will devising realty, the alleged promisor is deceased at the time of the filing of the suit to enforce the contract.[1] In the case at bar, the promisor, plaintiff, is not deceased and any title or interest in her property created by will could not pass until her death.[2]

Defendants' affirmative answer alleged that plaintiff "agreed that she would devise and bequeath the above-described premises in fee simple absolute to the defendants at the time of plaintiff's death." Defendant Coston Wilson did not offer clear and convincing evidence to substantiate this allegation. His testimony is equivocal. He testified that the agreement was, "The house is to be yours, *not* after she died." (Emphasis added.) Defendant Lois Wilson testified that the property would be deeded to the defendants by plaintiff "when she [plaintiff] made the last payment." However, Lois Wilson also testified that defendants made rental payments to the plaintiff in 1973 and 1974. Further, when plaintiff, with her attorney, called on

---

[1] Approximately 70 cases involving an oral contract to make a will have come before this court since 1898.

[2] The 1973 Oregon Legislature, in adopting Oregon Laws 1973, Chapter 506, Section 13 (ORS 112.270), has acted to clarify the bringing of such suits. ORS 112.270 provides:

"(1) A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, executed after January 1, 1974, shall be established only by:

"(a) Provisions of a will stating material provisions of the contract;

"(b) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

"(c) A writing signed by the decedent evidencing the contract.

"(2) The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills."

the defendants to advise them that she was going to sell the house, Lois Wilson raised no issue regarding an alleged oral contract to devise the property to defendants.

There is also evidence that the defendants did not perform their part of the alleged contract in that they failed to make some of the monthly rental payments and no home was provided for plaintiff upon her retirement. This is not a case wherein the defendants performed services for the plaintiff or paid consideration for the alleged contract to make a will devising plaintiff's realty to defendants. The evidence shows that the plaintiff purchased this property and made monthly payments of $75 on the contract until it was paid and also paid the real property taxes. In the meantime, she charged the defendants only $50 per month as rental. This is obviously less than a reasonable rental under any standard. When plaintiff was asked why she rented the house to defendants "for such a low price" she testified that "I thought I was doing them a good deed by letting them have it as cheaply as possible."

The testimony shows that this was a situation where plaintiff befriended defendants and decided to make defendants the beneficiaries in her will, leaving them the "residue" of her estate (not a specific devise of this particular real property). There was no consideration from defendants to plaintiff. The giving flowed from plaintiff to defendants. Subsequently, plaintiff, because of defendants' actions and lack of interest in her, changed her mind and decided to make her longtime employer the beneficiary of her estate. Also, it is apparent from the record that she needed funds from the sale of her house to sustain her during old age. Plaintiff was in the hospital just prior to trial. Revocability is one of the essential characteristics of a will unless abrogated by law or a valid agreement to the contrary.

■ We conclude that defendants failed to meet their

burden of proof by clear and convincing evidence that plaintiff would devise her premises "in fee simple absolute to the defendants at the time of plaintiff's death." Having concluded that defendants' equitable defense was not sustained by the evidence, the equitable defense is dismissed. *Quine et ux v. Sconce,* 209 Or 486, 490, 306 P2d 420 (1957). The case must be remanded to proceed with the action at law as framed in the pleadings.

Reversed and remanded for further proceedings not inconsistent herewith.