Argued and submitted, December 15, 1980, reversed February 3, 1981

In the matter of Gail Marie Grandy,
alleged to be a mentally retarded person.

STATE OF OREGON,
*Respondent,*

*v.*

GAIL MARIE GRANDY,
*Appellant.*

(No. 1215, CA 17656)

623 P2d 666

Steven H. Gorham, Salem, argued the cause and filed the brief for appellant.

Virginia L. Linder, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

ROBERTS, J.

**ROBERTS, J.**

This is the first appeal brought under Oregon's newly revised mental retardation commitment statute, ORS 427.005 et seq. (Oregon Laws 1979, c. 683). It involves a challenge by a 22 year-old woman, a resident of Fairview Training Center since the age of nine, to the institution's continuing legal ability to confine her.

Appellant is deaf. Because of cerebral palsy she is confined to a wheelchair, which she is able to propel with her feet. She communicates by means of sign language and an electronic communication board. Though she can feed herself and, to some extent, dress herself, because of her physical disability she needs assistance with personal hygiene, meal preparation and most movements. The parties do not disagree that appellant is unable to care for her personal needs. The issue is whether, in addition, she is mentally retarded. We find that she is not.

The 1979 Legislature revamped Oregon laws relating to commitment of the mentally retarded, to provide increased protection for those who are subjected to commitment procedures. These statutes now incorporate standards and procedures for voluntary and involuntary commitments, establish "clear and convincing evidence" as the burden of proof required at a commitment hearing and articulate a bill of rights for all training center residents. The statutes also restrict involuntary commitment to training centers to mentally retarded persons who, because of retardation, are either dangerous to themselves or others or unable to provide for their personal needs and are not receiving adequate care.[1] In addition, all involuntary commitments are limited to a period of one year, and state training centers are required each year to review the plan

---

[1] ORS 427.290 provides:

"After hearing all of the evidence, and reviewing the findings of the investigation and other examiners, the court shall determine whether the person is mentally retarded and because of mental retardation is either dangerous to himself or others or is unable to provide for his personal needs and is not receiving care as is necessary for his health, safety or habilitation. If in the opinion of the court the person is not mentally retarded, he shall be discharged forthwith. If in the opinion of the court the person is, by clear and convincing evidence, mentally retarded, the court may order as follows:

"* * * * *."

of care for each resident and to certify, by "clear and convincing justification," the resident's eligibility and need for continued residential care.[2] These changes were effective October 3, 1979.

Apparently, pursuant to the annual review procedure mandated by ORS 427.020(1), appellant was evaluated sometime in the spring of 1980. The State Training Center Review Board did not approve her certification for residential care; however, the Disposition Board did not consider release to be in appellant's best interests.[3] The Fairview superintendent, on March 13, 1980, initiated commitment proceedings in Marion County Circuit Court, as he was authorized to do by ORS 427.020(1).[4] The court then ordered an investigation pursuant to ORS 427.235(1).[5] A report filed with the court on April 14, 1980, recommended that appellant be *voluntarily* committed to the State Mental Health Division.[6] Following a hearing pursuant to ORS

---

[2] ORS 427.020(1).

[3] ORS 427.020(1) places authority for approving certification with the State Training Center Review Board. The board is not defined by statute, but seems to be any individual review board at any of the facilities for the mentally retarded operated by the Mental Health Division. 'Disposition Board' is not a term appearing anywhere in the statute, however, by its terms the division is empowered to determine whether release is in the resident's best interests and we assume this board functions with the division's authority.

[4] "* * * If the board does not approve of the certification or, if the resident objects to continued residential care and training, the resident shall be released pursuant to ORS 427.300 or, if the division considers release not to be in the best interest of the resident, the superintendent of the state training center where the person is a resident shall initiate commitment proceedings pursuant to ORS 427.235 to 427.270, 427.280 and 427.285 * * * ."

[5] ORS 427.235(1) provides:

"Any two persons may notify the judge of the court having probate jurisdiction for the county or the circuit court, if it is not the probate court but its jurisdiction has been extended to include commitment of the mentally retarded under ORS 3.275, that a person within the county is a mentally retarded person in need of commitment for residential care, treatment and training. Such notice shall be in writing and sworn to before an officer qualified to administer an oath and shall set forth the facts sufficient to show the need for investigation. The circuit court shall forward notice to the community mental health program director in the county if it finds the notice sufficient to show the need for investigation. The director or his designee shall immediately investigate to determine whether the person is in fact a mentally retarded person. * * *"

[6] During the investigatory portion of the commitment proceeding, appellant reportedly agreed to a voluntary commitment. At the subsequent hearing, however, she stated she did not want to remain at Fairview.

427.245(1),[7] the court on April 18, 1980, issued a certification of mental retardation and order of commitment. Appellant assigns two errors in the issuance of this order: first, that the court erred in committing appellant to a "voluntary"[8] commitment, and second, that there was insufficient evidence to satisfy the requirements of ORS 427.290 in finding appellant to be mentally retarded.

Our review in commitment proceedings is *de novo.* *See State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976); *State ex rel Vandenberg v. Vandenberg,* 48 Or App 609, 617 P2d 675 (1980).[9] We therefore examine the evidence and

---

[7] ORS 427.245(1) provides:

"If the court, following receipt of an investigation report under ORS 427.235, concludes that there is probable cause to believe that the subject of the investigation is in fact a mentally retarded person, it shall, through the issuance of a citation as provided in subsection (2) of this section, cause the person to be brought before it at such time and place as it may direct for a hearing to determine whether the person is mentally retarded. The person shall be given the opportunity to appear at the hearing. If the person is detained pursuant to ORS 427.255, the court shall hold the hearing within seven business days."

[8] Apparently because of statements made by the Fairview unit director, Dr. Haydon, in appellant's psychological summary review, that appellant wished to remain at Fairview, the trial court disregarded appellant's statement in open court that she did not wish to remain at that institution, and made an oral finding that "for purposes of voluntary commitment," she was mentally retarded. Appellant is correct that there is no such procedure. The state contends, however, that this proceeding is one under ORS 427.020, a re-commitment proceeding initiated when certification is disapproved by the review board. Since the procedure under 427.020 is the same when the resident objects to continued care as it is when certification is denied, we have treated this as a proceeding for involuntary commitment under ORS 427.020(1).

[9] The trial court's certification and order "finds and certifies that said Gail Marie Grandy is a mentally retarded person and that by reason thereof is in need of care, custody or training * * *." We note that this is the standard required by the old statute, which Oregon Laws 1979, c. 683 repealed. Former ORS 427.025 (Oregon Laws 1967, c. 534 § 22, repealed by Oregon Laws 1979, c. 683 § 37) required the court to find a person in need of care, custody or training before a precommitment examination could be ordered. A finding by the examining institution of mental deficiency was the sole requirement for court certification under former ORS 427.059 (Oregon Laws 1965, c. 339 § 7, repealed by Oregon Laws 1979, c. 683 § 37). It appears that the Marion County Probate Department is using outdated forms for commitment orders since the document further orders "that there be furnished to the Mental Health Division, as required by ORS 427.090, all available information concerning the person committed by this order except such information as shall have been furnished previously." ORS 427.090 was repealed by Oregon Laws 1979, c. 683 § 37.

draw our own conclusions as to whether the record shows by clear and convincing evidence that appellant is mentally retarded and because of retardation unable to provide for her personal needs.

"Mental retardation" is defined at ORS 427.005(10):

> " 'Mental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period. Persons of borderline intelligence may be considered mentally retarded if there is also serious impairment of adaptive behavior. Definitions and classifications shall be consistent with the Manual on Terminology and Classification in Mental Retardation of the American Association on Mental Deficiency, 1977 Revision. Mental retardation is synonymous with mental deficiency."

"Significantly subaverage" is defined at ORS 427.005(14):

> " 'Significantly subaverage' means a score on a test of intellectual functioning that is two or more standard deviations below the mean for the test."

"Adaptive behavior" is defined at ORS 427.005(1):

> " 'Adaptive behavior' means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected for age and cultural group."

---

Under the new commitment procedure set forth in ORS 427.290, in a proceeding such as this, the court is required to make a three-part finding:

> "After hearing all of the evidence, and reviewing the findings of the investigation and other examiners, the court shall determine whether the person is mentally retarded and because of mental retardation is either dangerous to himself or others or is unable to provide for his personal needs and is not receiving care as is necessary for his health, safety or habilitation. If in the opinion of the court the person is not mentally retarded, he shall be discharged forthwith. If in the opinion of the court the person is, by clear and convincing evidence, mentally retarded, the court may order as follows:
>
> "* * * * *"

The circuit court's finding that appellant "is a mentally retarded person and that by reason thereof is in need of care, custody or training" could justify either an independent finding that *because* of retardation the person is in need of care, or a presumption that *since* the person is retarded he or she is in need of care. Such a finding is of questionable adequacy under the new statute; however, we need not decide whether the finding was adequate since we review *de novo*.

The formal standards of the American Association on Mental Deficiency manual, attached as an appendix to appellant's brief, were not included as part of the trial record below. However, from the psychologists' testimony we discern that the "significantly subaverage" level referred to by the statute is interpreted to mean an IQ test score of below 67 on the Stanford-Binet test, or 69 on the Wechsler Adult Intelligence Scale. In addition, both the statute and the AAMD guidelines provide that persons with IQs up to ten points above these levels may be so impaired in their adaptive behavior that they can be classified as mentally retarded. There was testimony that no one with an IQ over 77 could be classified as mentally retarded.[10] Since both parties agree appellant's adaptive behavior is significantly impaired because of her physical disabilities, the crucial issue is whether there is clear and convincing evidence that her level of intellectual functioning places her within the levels of mental retardation.

Dr. Fuller, a psychologist specializing in work with the deaf and multihandicapped, was asked by Fairview to provide a psychological evaluation of appellant. He testified that based on the intelligence tests he administered, his estimate of her IQ was 69 to 83, and that those scores were, if anything, low.[11] Dr. Fuller stated unequivocally that while appellant was retarded adaptively, he did not believe she was retarded intellectually. He also stated that, in his view, her inability to care for herself stemmed from physical deficiencies and not intellectual ones.

The only other psychologist to testify was Dr. Haydon, a Fairview unit director, who prepared appellant's psychological summary review for the hearing. He did not administer any tests to appellant. He testified his appraisal of her was based on a review of her test performances and adaptive functions over the years and his five years of personal observation of her at Fairview. Dr. Haydon testified he felt Dr. Fuller's IQ estimates were probably very good, but because he felt appellant was adaptively very

---

[10] We assume this is 77 on the Stanford-Binet scale, 79 on the Wechsler.

[11] Dr. Fuller testified he adjusted "test protocols" to accommodate appellant's disabilities; he did not adjust the scores.

retarded, he used the AAMD's "ten-point spread" to bring her within an "overall" diagnosis of retardation. Most importantly, however, Dr. Haydon admitted his conclusions were at least partially based on a concern that appellant would not receive proper care outside Fairview. He testified that he could not reach a decision as to appellant's retardation independent of her physical condition and that her inability to develop appropriate social skills had been "compromised" by 13 years of institutionalization and lack of educational opportunities.

■ ■    Reviewing this record, we find not only a lack of clear and convincing evidence that appellant is mentally retarded, but clear evidence to the contrary, i.e., that she does not meet the statutory standard required for involuntary commitment. Under ORS 427.290 the court is required to find four things:

(1)    A significantly subaverage general intellectual functioning;

(2)    A concurrent deficit in adaptive behavior;

(3)    That these two deficiencies were first manifested in the time period before the 18th birthday;[22] and

(4)    That *because* of intellectual and adaptive deficiencies the person is either dangerous to himself or others or unable to care for his or her personal needs. The evidence before us shows conclusively only that appellant is a physically disabled individual whose intelligence level, which is perhaps subaverage, is difficult to measure. We conclude that the order for her commitment as a retarded person was in error for two reasons. First, the only evidence of appellant's IQ indicated a low estimate of between 69 and 83, which places her level of intellectual functioning above the AAMD's "retarded" classification. Both psychologists agreed these estimates were accurate. According to Dr. Fuller, appellant was not retarded; according to Dr. Haydon, she was retarded only by invoking the AAMD's ten-point leeway allowed for persons with a serious impairment of adaptive behavior. "Clear and convincing evidence" requires that truth of the facts asserted be highly

---

[22] This requirement was not contested.

probable. *Johnson v. Wilson,* 276 Or 69, 554 P2d 157 (1976); McCormick, Evidence 796 § 340, (2d ed E. Cleary) (1972). The state has not shown that it is highly probable appellant demonstrates significantly subaverage intellectual functioning.

■ Second, there is no evidence at all to indicate appellant is unable to provide for her personal needs *because* of mental retardation. The evidence indicates she is unable to care for herself because of physical deficiencies, not intellectual ones. This requirement of ORS 427.290, added by the 1979 Legislature, was a significant change in the requirements for involuntary commitment. The statute no longer authorizes institutionalization on the sole basis that a person meets the AAMD's definition of "mentally retarded"; or because a person is unable to properly care for his or her own personal needs. The new statute requires that these factors exist concurrently to justify involuntary civil commitment to a mental institution and that inability to provide for one's personal needs must arise out of the mental retardation. It is not sufficient that this inability arises from some independent source, such as physical disability. The state has failed to meet its burden of proof and the order of commitment is reversed.

Reversed.