Argued and submitted April 2, reversed November 5, reconsideration denied
December 17, 1985

# WILLBANKS,
*Respondent on Review,*

*v.*

# GOODWIN et al,
*Petitioners on Review.*

(82-9-385; CA 29651; SC S31266

709 P2d 213

Ferris F. Boothe, Portland, argued the cause and filed briefs for petitioners on review.

Stephen F. Crew, Portland, argued the cause for respondent on review. With him on the briefs was O'Donnell, Ramis, Elliott & Crew, Portland.

Paul Gerhardt, Portland, filed a brief *amicus curiae* for Oregon Land Title Association.

LENT, J.

## LENT, J.

We allowed review to decide whether an action for specific performance of an alleged contract to make a will and seeking to impose a constructive trust on the assets of a decedent's estate is a "claim," which would be barred by ORS 115.005(3)[1] if not presented to the personal representative within 12 months after the first publication of notice to interested persons. The trial court and the Court of Appeals held that this statute did not apply to the plaintiff's action. We reverse without reaching that issue because the evidence does not clearly convince us that the contract alleged by the plaintiff ever existed.

## I. *Scope of Review*

■    In this equity case we do not simply assume the facts as found by the courts below. Because the Court of Appeals tried the cause anew upon the record as required by ORS 19.125(3),[2] *Willbanks v. Goodwin,* 70 Or App 425, 427, 689 P2d 1004 (1984), we "may" limit our review to questions of law. ORS 19.125(4).[3] ORS 19.125(4) gives us an option, when allowing the petition, to limit our review. *Genest v. John Glenn Corporation,* 298 Or 723, 725, 696 P2d 1058 (1985); *Louisiana-Pacific v. Lumber and Sawmill Workers,* 296 Or 537, 545, 679 P2d 289 (1984). We did not exercise that option when we allowed this petition, so we review anew upon the record.

---

[1] ORS 115.005 provides:

"(1) Claims against the estate of a decedent, other than claims of the personal representative as a creditor of the decedent, shall be presented to the personal representative.

"* * * * *

"(3) If notice to interested persons is published, claims not presented before the expiration of 12 months after the date of the first publication of notice to interested persons, or before the date the personal representative files his final account, whichever occurs first, are barred from payment."

[2] ORS 19.125(3) provides:

"Upon an appeal from a decree in a suit in equity, the Court of Appeals shall try the cause anew upon the record."

[3] ORS 19.125(4) provides:

"When the Court of Appeals has tried a cause anew upon the record, the Supreme Court may limit its review of the decision of the Court of Appeals to questions of law."

Because plaintiff's cause is predicated on the existence of the alleged contract, we first decide whether the alleged contract was made.

## II. *Undisputed Facts*

The parties do not dispute several facts which provide the background of this controversy.

Lillian Willbanks died on May 15, 1981, leaving a will dated July 18, 1978, and admitted to probate on May 22, 1981. This will and its August 26, 1980, codicil left the bulk of Lillian's estate to LaVonne Mars, one of her two grandchildren, and to LaVonne's children as follows:

"THIRD: I give the sum of $10,000.00 to my trustee hereinafter named, in trust for the following purposes:

"(a)  Said trustee shall hold said trust, and pay therefrom to my son, Charles Willbanks [Charles, Jr.], no more than $125.00 per month, including both principal and interest. In the event of the death of my son, Charles, the trust shall be paid out by my trustee at the same rate of not more than $125.00 per month to my daughter-in-law, Lorraine Willbanks.

"(b)  Said trustee may sell, convey, transfer, invest, or may borrow money, pay debts, compromise, settle, waive or sue on claims, and do everything and anything necessary in the management of said trust as fully as I could do myself.

"FOURTH:  I give my home, household goods, farm of 47+ acres and including tools, implements and equipment of every type located at Carus, on Highway 213, Clackamas County, Oregon, to my trustee hereinafter named, in trust for my granddaughter, LaVonne Mars, and her three daughters, Ember, Amber and Angel, a one-quarter share each, with the right of representation in each case. The personal property on the farm, and the use and possession of the land and improvements shall be immediately delivered to such beneficiaries in equal shares. My trustee shall simply hold title to the farm, so that there shall be no sale of the farm nor any portion thereof prior to the 25th birthday of LaVonne Mars' youngest daughter.[4] LaVonne and her daughters may manage and

---

[4]No question has been raised in these proceedings concerning the rule against perpetuities.

maintain the farm as they see fit until legal title is delivered to them.

"Immediately when LaVonne Mars' youngest daughter attains the age of 25 years, the farm title portion of the trust shall be distributed to LaVonne Mars and her three daughters, Ember, Amber and Angel, a one-quarter share each, with the right of representation as to LaVonne and the three great granddaughters; otherwise equally among the survivors of this class of four.

"FIFTH:   I hereby instruct my personal representative to sell all my rental properties, and other assets, to liquidate the same, and all the said residue of my estate, wheresoever situate of which I may die seized or possessed, or to which I may be entitled at the time of my death, I give in equal shares to be divided among my two grandchildren, LaVonne Mars and Will C. Willbanks [plaintiff herein], and my five great grandchildren, Ember, Amber and Angel Mars, and Amy and Sally Willbanks, with the right of representation of any who might predecease me."

The codicil of August 26, 1980, provided:

"Paragraph Third shall read as follows:

"THIRD:   I give the sum of $100.00 each to my son, Charles Willbanks, and to his wife, Lorraine Willbanks.

"I make this change in my will for the reason that both my late husband, Charlie, and I have, since his death, made rather constant and substantial outlays of monies and property to my son and wife, or on their behalf."[5]

This case arose when plaintiff Will Charles Willbanks, Lillian's other grandchild, claimed that Charles, Sr., and Lillian had contracted to make wills providing that plaintiff and LaVonne would eventually share the grandparents' estate equally. On June 2, 1981, defendant Goodwin, personal representative of Lillian's estate, first published a notice to persons interested in that estate. On August 28, 1982, plaintiff presented to the personal representative a "Claim of Will Charles Willbanks against the estate of Lillian C. Willbanks," alleging "the execution of mutual and reciprocal wills by Charles P. Willbanks [Sr.,] and Lillian C. Willbanks on December 8, 1959, and the breach by Lillian * * * of an

---

[5] We assume that this provision does not imply that Charles, Sr., has made any "outlays of monies and property" since his death.

agreement not to revoke such wills following the death of Charles [Sr.,] * * *." No copy of Lillian's 1959 will was produced, but the parties agree that it mirrored her husband's will, and provided as follows:

"SECOND, I hereby give, devise and bequeath unto my son, Charles Richard Willbanks, the sum of Fifty ($50.00) Dollars.

"THIRD, I hereby give, devise and bequeath all the rest, residue and remainder of my property, both real, personal and mixed unto my husband * * *.

"FOURTH, In the event my said husband * * * predeceases me, then and in that event, I hereby give, devise and bequeath all my property both real, personal and mixed unto my two grandchildren, to-wit: LaVonne May Mars, now residing at Clackamas, Oregon; and Will Charles Willbanks, now residing with his parents at Route 3, Oregon City, Oregon, in equal shares."

Charles, Sr., died on December 21, 1968, and pursuant to his probated 1959 will, Lillian took all his property except the $50 gift to Charles, Jr.[6]

Defendant disallowed plaintiff's claim on August 31, 1982, and on September 23, 1982, plaintiff filed this action against the personal representative and LaVonne and her children, praying for a judgment "specifically enforcing the agreement * * * to make mutual and reciprocal wills, and not to revoke such wills" and "impressing a constructive trust" upon the assets of Lillian's estate. Defendants moved to dismiss and, later, to strike the complaint as time barred by ORS 115.005(3). The circuit court denied the motions and, after a court trial, found for plaintiff that there was an agreement as alleged and that ORS 115.005(3) was not a bar. The Court of Appeals affirmed.

These facts frame the question whether the 1959 wills were executed pursuant to a contract and, if so, whether the

---

[6] The record does not show what property, if any, of Charles, Sr., passed to Lillian by his will. Any property held under tenancy with right of survivorship, such as real property held as tenants by the entirety, would not pass by the will. If a part of the property of Charles, Sr., and Lillian was actually held with right of survivorship, neither could have defeated the other's contingent, or inchoate, right to take the whole of the property except by some *ante mortem* action to destroy the other tenant's right of survivorship.

disposition of property for which the wills provided became irrevocable before Lillian changed her will in favor of LaVonne and her children.

## III. *Standard of Review*

The plaintiff's shifting theories in this case complicate our inquiry whether the evidence establishes a contract. At first, he contended that Charles, Sr., and Lillian contracted to make mutual reciprocal wills and to make those wills irrevocable. Part II, *supra.* On appeal he abandoned the second half of that contention, arguing instead that "there need be no express agreement that the will is irrevocable. * * * It is the rules of equity imposed by well established equitable principles that renders the wills irrevocable." He maintains that it would be inequitable to allow Lillian's disposition of her estate contrary to the terms of her 1959 will after she took Charles, Sr.'s, property under his will.[7] At oral argument in this court, plaintiff urged that the agreement of Charles, Sr., and Lillian made the contract, not the will, irrevocable, and that Lillian obtained only a life estate in Charles, Sr.'s, property that passed to her under his will.

■      Under any of these theories, however, the parties and both courts below agree that the plaintiff had the burden of proving the contract by "clear and convincing evidence." We, too, agree that a plaintiff must meet that standard to prove the existence of any legally binding agreement to dispose of property in accordance with the terms of a testamentary instrument. *American Nat'l Red Cross v. Wilson,* 274 Or 237, 240, 545 P2d 883 (1976); *Taylor v. Wait,* 140 Or 680, 684, 14 P2d 283 (1932); *Stevens v. Myers,* 91 Or 114, 168-70, 177 P 37, 2 ALR 1155 (1919). *See also Pantano v. Obbiso,* 283 Or 83, 87, 580 P2d 1026 (1978) ("Proof of a conduct creating a constructive trust must be by strong, clear, and convincing evidence - evidence that is of 'extraordinary persuasiveness.' "); *Johnson v. Wilson,* 276 Or 69, 76, 554 P2d 157 (1976) ("An oral contract to make a will devising real property must be proved by clear, concise and convincing evidence."); *Holman et al v. Lutz et al,* 132 Or 185, 208, 282 P 241, 284 P 825 (1930) (proof of irrevocable contract must be established by "the most clear and satisfactory evidence"). A Note and Comment, *Oral*

---

[7] *See* note 6, *supra.*

*Contracts to Make Wills in Oregon,* 42 Or L Rev 133, 147 (1963), well expresses the reason for this rule:

> "[The promisee's or beneficiary's] testimony stands uncontradicted in most cases because the alleged promisor is usually dead. The contract is often alleged to have been made long prior to the suit to enforce it; thus the promisee and the witnesses * * * usually testify from faded or blurred memory. The opportunity for fraud is great and even if one does not have an actual intent to defraud, one who feels that a decedent was obligated in some manner may rationalize the decedent's expressed intent to provide for him by will into a contract to do so." (Footnote omitted.)

That reasoning especially applies here, where suit was brought, and the witnesses testified, nearly a quarter-century after the contract was allegedly made.

Both courts below held that plaintiff had established the contract by "clear and convincing evidence," but neither articulated what it understood this standard to require. Although judges and lawyers know that "clear and convincing evidence" is a standard greater than "preponderance of the evidence" and less than "beyond a reasonable doubt," it is less certain how the intermediate standard is to be determined and applied. While the use of these three phrases assumes that they communicate significantly different standards to triers of fact, some empirical research reveals that they do not necessarily do so, even to people expected to be more receptive to their nuances. *See, e.g.,* Comment, *Evidence: The Validity of Multiple Standards of Proof,* 1959 Wis L Rev 525.[8] Commentators have recognized that the confusion stems in part from the "straddling involved in adopting some standards which point toward the jury's mental state and others which treat probability as an intrinsic quality of the 'evidence' and therefore of the 'facts' themselves." Ball, *The Moment of Truth: Probability Theory and Standards of Proof,* 14 Vand L Rev 807, 809 (1961). *See also* Birmingham, *Remarks on "Probability" in*

---

[8] In this study, mock juries selected "by expediency and by the desire to use individuals of above average intelligence" (mostly college and graduate students) were given typical instructions on these standards and asked to apply them to the same mock testimony and exhibits. The standards used made little difference; about the same percentage of jurors answered "yes" to special verdict questions when each standard was used. 1959 Wis L Rev at 530. The jurors were also asked to rank the standards from most difficult to easiest to satisfy. Only a quarter ranked them correctly. *Id.* at 534-35.

*Law: Mostly, a Casenote and a Book Review,* 12 Ga L Rev 535 (1978), questioning the validity of the law's use of the concept of probability.

In *Cook v. Michael,* 214 Or 513, 526-27, 330 P2d 1026 (1958), this court sought to reduce the confusion by choosing to express the difference in terms not of the intrinsic "weight" of the evidence but of the subjective "amount of belief" which the fact trier must have to find for the party with the burden of persuasion. "Preponderance of the evidence" means the jury must believe the facts asserted "are more probably true than false," while "beyond a reasonable doubt" means that they are "almost certainly true." *Id,* 214 Or at 527. Ever since *Cook,* we have held that evidence, to be "clear and convincing," must establish that the truth of the facts asserted is "highly probable." *In re Morrow,* 297 Or 808, 817, 688 P2d 820 (1984); *Jones v. Jones,* 276 Or 1125, 1132, 557 P2d 239 (1976); *Thom v. Bailey,* 257 Or 572, 578-79, 481 P2d 355 (1971); *Paulson v. Paulson,* 241 Or 88, 91-92, 404 P2d 199 (1965).

The unelaborated phrase "highly probable" runs the same risk as does "clear and convincing evidence"; it may serve only to rationalize decisions after the fact rather than provide guidance for how to decide. Nevertheless, we discern some guidance from the commentators who first suggested expressing the standard in terms of probability and degree of belief. Professor Morgan, who believed that "[b]y phrasing the charge in terms of probability, the pertinent distinctions can be made easily understandable," argued that a proposition should be considered established by clear and convincing evidence if "its truth is much more probable than its falsity." Morgan, *Instructing the Jury Upon Presumptions and Burdens of Proof,* 47 Harv L Rev 59, 66-67 (1933). Professor McBaine proposed an instruction for juries that:

"The burden imposed is to convince you that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist."

McBaine, *Burden of Proof: Degrees of Belief,* 32 Cal L Rev 242, 263 (1944). By phrasing the test in terms of the relative probabilities that the fact asserted existed and that it did not, this approach properly focuses the trier's attention on those portions of the evidence which support the alternative

inferences from the testimony, including undisputed testimony.

We recognized in *Paulson v. Paulson, supra,* that where evidence is "not basically in dispute, it is the inferences to be drawn from this evidence" in support of the plaintiff's position which must be shown to be highly probable. 241 Or at 91-92. Here, the dispute concerns primarily not whether the witnesses spoke truthfully, but whether from the facts to which they testified it should be inferred that the 1959 wills were made pursuant to a contract, rather than because of "mutual love and affection" or some other reason. *See Taylor v. Wait, supra,* 140 Or at 685. We adhere to our holding in *Cook* that "clear and convincing evidence" means that which convinces the trier that an assertion is "highly probable," and simply observe that courts may best guide the trier in determining whether that standard has been met by asking the trier to consider whether one interpretation of the evidence is "much more probably" true than alternative interpretations. We thus inquire, as Judge Weinstein and Professor Morgan have suggested, whether the evidence bearing on those alternative interpretations of the events establishes "that [the contract's] existence is *much more probable* than its nonexistence." See Weinstein, *Basic Problems of State and Federal Evidence by Edmund M. Morgan* 18 (5th ed 1976) (emphasis added).[9]

■     Plaintiff argues that although we review *"de novo"* using the "clear and convincing evidence" standard, we should give great weight to the trial court's factual findings. We have given such weight in other cases involving claims for specific performance of oral contracts, including at least one in which the plaintiff alleged a contract to make a will and in which we examined the evidence against the "highly probable" standard established in *Cook, Paulson v. Paulson,* 241 Or at 91-92, 94; however, even in *Paulson,* we first undertook our own interpretation of the evidence. *See id.* at 92-94. There, we affirmed the finding of a trial court that the evidence did not show it

---

[9] *See also* McCauliff, *Burdens of Proof: Degrees of Belief, Quanta of Evidence, or Constitutional Guarantees?,* 35 Vand L Rev 1293 (1982) (presenting results of surveys in which federal judges were asked to express their understanding of the three standards in percentages of certainty required; average for "clear and convincing evidence" was 75 percent).

highly probable that a contract to make a will existed. We give weight to the findings of trial courts, moreover, primarily for reasons which do not apply so forcefully in this case. It is true that *Paulson* involved disputes not over the evidence, but over the inferences to be drawn from it; however, there and in other cases we relied heavily on the trial courts' findings primarily because those courts could better identify the "feelings," "prejudices," and "opinions" of the witnesses, and so could better evaluate the credibility of testimony. *See Cline v. Larson,* 234 Or 384, 418, 383 P2d 74 (1963) (Denecke, J., dissenting), and *Clauder v. Morser,* 204 Or 378, 391-92, 282 P2d 352 (1955), both cited in *Paulson,* 241 Or at 94. *See also Thom v. Bailey, supra,* 257 Or at 578-79 (holding that plaintiff's evidence had to satisfy *Cook's* "highly probable" test and deciding for plaintiff despite conflicting testimony, noting that the trial judge was "in a far better position than this court to pass upon the credibility of witnesses"). As we have already noted, the present question is not whether particular witnesses were credible, but whether it is proper to infer from essentially undisputed testimony a high probability that the mutual reciprocal wills were made pursuant to a contract.

IV. *Evidence Regarding Existence of Contract*

The plaintiff does not allege that this case involves either wills which themselves "disclose a contract to make certain disposition of property," or a contract in which services were "rendered in consideration of a promise to devise or bequeath property"; rather, he contends that while "the wills themselves do not refer to each other or disclose any contract, * * * nevertheless taken into consideration, together with all the facts and circumstances surrounding their execution," they provide proof of a contract. To prove that contract, he emphasizes the 1959 wills themselves, the history of the family relationships, the circumstances surrounding execution of the wills, and the statements of Charles, Sr., and Lillian.

A. *Existence of mutual, reciprocal wills*

The parties agree that the 1959 wills of Charles, Sr., and Lillian were executed at the same time and place, prepared by the same attorney, attested by the same witnesses, and identical (except that where Lillian's will referred to

Charles, Charles' will referred to Lillian). The mere fact that two persons simultaneously made wills providing for the same ultimate disposition of property does not establish that they acted pursuant to any binding agreement to do so. Similar tastes, or love and affection for each other, can just as well account for such wills. *American National Red Cross v. Wilson, supra,* 274 Or at 240; *Taylor v. Wait, supra,* 140 Or at 684-85.[10] The wills of Charles, Sr., and Lillian should be considered with all the other "peculiar facts" of this case to determine whether it is much more probable that a contractual agreement, rather than some other reasons, caused Charles, Sr., and Lillian to execute the 1959 wills. *Taylor,* 140 Or at 685.

### B. *History of family relationships*

There is no important disagreement about the relationships between members of the Willbanks family. We agree with the Court of Appeals that:

> "The record is replete with evidence of Lillian's animosity toward her son, Charles, Jr., and her grandson, Will * * * and her favoritism toward her granddaughter LaVonne * * *; the record also establishes that Charles, Sr., did not share those feelings but had good relationships with all."

70 Or App at 434. The testimony of Charles, Jr.'s, wife, Lorraine, of the plaintiff, and of two long-time family friends established Lillian's hostility to Charles, Jr., and her preference for LaVonne over plaintiff, which she often expressed with gifts to LaVonne. Lillian's affection for LaVonne did not diminish even after a legal battle between them during 1975-76 over LaVonne's management of Lillian's assets while serving as conservator; Lillian forgave the judgment that was entered against LaVonne in that case and retained LaVonne as the primary beneficiary in her 1978 will and 1980 codicil.

---

[10] *Schramm v. Burkhart,* 137 Or 208, 212, 2 P2d 14 (1931), found "satisfactory proof" of a contract where the plaintiff's evidence showed only the existence, and simultaneous execution, of mutual reciprocal wills making identical final dispositions. To the extent *Schramm* held that mutual reciprocal wills that in no way refer to each other can suffice to prove a contract, merely because "they show a clear intention on the part of both testators," *id.* at 211, this court implicitly overruled that holding in *Taylor,* and we now expressly do so. The same "clear intention," of course, appears on the face of each pair of reciprocal wills. We agree with Professor Sparks that the decision in *Schramm* resulted "from a confusion of evidence of an understanding or a common plan with evidence of a contract." Sparks, *Contracts to Make Wills* 29-30 (1956).

Lorraine and plaintiff also testified that Charles, Sr., was not so biased and got along well with Charles, Jr., plaintiff and LaVonne.

The differing affections of Charles, Sr., and Lillian for family members created tensions between the two of them concerning disposition of their property. Lorraine testified to a conversation in which Charles, Sr., told her "I want to divide whatever I have equally between my grandchildren. * * * I can't leave a lot to my son because it just makes family matters worse."

"Q. What was he referring to when he said it would make family matters worse?

"A. Well, my mother-in law and he didn't agree about evidently, what was going on and she did not want Will or Charles to have anything. And he felt that Will and LaVonne should be treated equally."

Plaintiff related an incident in which his grandfather bought him an accordion worth over $500, which Lillian did not want Charles, Sr., to buy:

"Q. How do you know your grandmother didn't like that?

"A. It was very obvious. On the way to town she didn't speak to my grandfather, she didn't speak to me."

Plaintiff testified about a conversation with Charles, Sr., in December, 1967:

"One of the things he wanted to say was the reason that my father was only briefly mentioned in the will because it was a trade-off with my grandmother.

"* * * * *

"Q. Did he indicate why he was cutting your father off?

"A. Yes, he said it was a trade-off with my grandmother because it was the only way that she would agree to split the estate 50-50. * * *

"Q. Did he indicate anything or make any statement to the effect that he was attempting to keep peace with your grandmother?

"A. That — that was the gist of the conversation. That's the only way that he could have a tolerable relationship with my grandmother."

Plaintiff testified that Charles also told him in "early summer of '68" that "the only way he could get my grandmother to agree to that was to * * * take my father out of the will."

### C.  *Circumstances surrounding execution of the wills*

Besides testimony by Lorraine and plaintiff that years later Charles, Sr., told them how he and Lillian had written their wills, the trial court heard testimony by Marie Martin, secretary to the attorney, Biggs, who drafted the wills. We agree with the trial court and Court of Appeals that her testimony established that Charles, Sr., and Lillian initially disagreed about their wills, but thereafter somehow came to an agreement.

We accept Martin's testimony as establishing the following.

In regular practice, once a client had decided what he or she wanted in a will, Biggs would call Martin in to take his dictation regarding terms of the will. Biggs did this because it enabled clients to hear what was being dictated and to make necessary corrections and changes then rather than later, and because Biggs himself "wasn't good at memory work." On the Willbanks' first visit to Biggs' office, Biggs did not call Martin in, but "as they were leaving, they were not too happy apparently from what I gathered and Mr. Biggs said to them, well, you go and talk it over and come back. And if you want to make the will, fine."

Martin testified to a conversation she had with Biggs after the Willbanks left the office, but did not clarify what Biggs said to them about what kind of wills he was willing to prepare for them. Biggs told Martin that the Willbanks "couldn't agree as to what they wanted * * *. [T]he problem was, that Mr. Willbanks wanted a will that couldn't be broken, both of them to make wills that couldn't be broken. * * * And she didn't want that kind of will."

"Q.   * * * Then what happened?

"A.   Well, he told me that he would not make that kind of a will. He said that if they wanted that kind of will, they would have to go to another attorney, that he would not make that type of will."

Later she testified that "[Biggs] told [Charles, Sr.,] if they

wanted that kind of will, they would have to go to someone else." On cross examination by defendant's counsel, Martin testified that Biggs had a policy against either a joint will, one document signed by both parties, or a will "where they agree in the will that they cannot break it or change it after the death of the other."

"Q.   *** Isn't that the essence it was going to be a joint will or a will which would contain within its four corners some reference to an agreement not to revoke?

"A.   Yes, that's right."

On redirect, she testified that "If the party died, the other one couldn't change it, he would not draft that kind of will." While there is no doubt that Biggs had a policy against preparing either joint or mutual wills that could not be revoked, it is not clear how well he communicated that policy to his clients or what they understood it to mean. Martin was not present during Biggs' conversation with the clients.

Mr. and Mrs. Willbanks later returned to Biggs' office, and Biggs called Martin in to take dictation of the wills. Again, she had not been present during Biggs' consultation with them. During dictation, she heard no statements by Lillian and no reference to joint wills or to revocability of the wills.

Martin testified that when Mr. and Mrs. Willbanks returned to sign the wills, Lillian was asked in "that usual format" whether it was her last will and testament. Martin "couldn't tell you verbatim what was the words," but Lillian's answer was to the effect that "Well, it isn't exactly what I wanted but I will go along with Charles." She could not remember whether Lillian used the word "compromise," and recalled no comments by Charles, Sr., at that time.

On cross-examination, she agreed with defendant's counsel that "these ended up being mutual and reciprocal wills in common which is what a large percentage of husbands and wives make routinely." She testified further that Biggs never drafted a will that one spouse could not change after the other died; however, had there been any agreement that these wills could not be revoked, she testified, Biggs would have mentioned that to Lillian and would have expressly dictated that agreement as part of the 1959 wills.

On February 20, 1969, two months after Charles, Sr.'s, death, Lillian, accompanied by LaVonne, returned to Biggs' office to make a new will. Again, Martin took Biggs' dictation in Lillian's presence. Lillian stated that she did not feel that plaintiff could take care of money and that she therefore wanted to favor LaVonne. Martin did not remember any statements by anyone at that time about the 1959 will, and she heard Biggs make no objection to Lillian's preparing a new will.

### D. *Statements of the testators*

While Martin's testimony about Lillian's remark that she would go along with Charles was the only evidence of a statement by Lillian about her testamentary intentions, three witnesses testified to statements by Charles, Sr.

One witness, long-time family acquaintance Gene Greenslitt, merely stated that on one occasion Charles, Sr., told him that "his two grandchildren would end up with [the property] * * * they was both going to be equal and I didn't see any difference." Greenslitt testified to no statement indicating disagreement or agreement with Lillian.

The second, Lorraine, said that in September, 1964, Charles told her that "I want to divide whatever I have equally between my grandchildren," as he couldn't leave much to his son "because it just makes family matters worse" since Lillian "did not want Will or Charles [Jr.] to have anything." He said he had "fixed" the will so plaintiff and LaVonne "will both share alike." In 1968, on the family farm, Charles, Sr., told Lorraine and plaintiff that plaintiff and LaVonne "are going to be treated exactly alike."

The third witness, plaintiff, testified that in December, 1967, in early summer, 1968, and on the 1968 occasion when Lorraine was also present, Charles, Sr., told him that he would give very little of his estate to Charles, Jr., but that when Charles, Sr., and Lillian were both dead, the estate would be split evenly between plaintiff and LaVonne. During the first of these conversations, Charles made the remarks about "a tradeoff" to "keep peace" with Lillian and during the second, the comment that this was "the only way he could get [Lillian] to agree," to which we have already referred, Part IV C, *supra.*

## V. *Evaluating the Evidence*

In deciding whether these parties made a contract in 1959, we can give little guidance to those who will draft contracts to make wills in the future. The legislature sought to provide that guidance in 1973 by enacting ORS 112.270, which now provides:

"(1) A contract to make a will or devise, or not to revoke a will or devise * * * executed after January 1, 1974, shall be established only by:

"(a) Provisions of a will stating mutual provisions of the contract;

"(b) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

"(c) A writing signed by the decedent evidencing the contract.

"(2) The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills."

We decide here only what must be shown to prove the existence of a contract allegedly made before the effective date of this statute.

Most troubling in this case is the significance to be given to the term "agreement" or its equivalents (*e.g.,* "trade-off") when one of the parties has used it to describe his or her testamentary arrangements. The evidence in this case clearly convinces us that Charles, Sr., and Lillian initially disagreed about the disposition of their property, that they agreed in December, 1959, to the extent they executed virtually identical wills, and that on several occasions Charles, Sr., indicated to others that this disposition was the result of an agreement with Lillian. We also find it is much more probable than not that Charles, Sr., and Lillian, who felt quite differently about their son and grandchildren, were acting at least in part from something other than "similar tastes and affections," *see American Nat'l Red Cross,* 274 Or at 240, when they each decided to give but $50 to their son and to split the remainder between plaintiff and LaVonne. But the mere fact of an agreement does not establish an enforceable contract. *Ernest et ux v. Pezoldt et al,* 223 Or 97, 105, 353 P2d 621 (1960) ("The

term 'agreement,' as interpreted by a layman, does not necessarily imply a legally binding contract"). We agree with Professor Sparks that the rule against presuming from the mere presence of mutual wills that they were executed in pursuance of a contract is not

> "altered by evidence that the parties had 'agreed' to the making of such wills. Of course they had so agreed. The mere presence of such wills reveals that the parties must have arrived at an understanding or agreement concerning their testamentary dispositions. Such discussions and understandings between persons of close affinities, especially between husbands and wives, are not unusual and the fact that they have taken place is no indication that there has been any thought of a binding contract."

Sparks, *Contracts to Make Wills* 27-28 (1956).

Nevertheless, in several cases, this court has found contracts based on little more than the existence of mutual wills executed at the same time and place, along with extrinsic evidence of the testators' wishes, if there was the slightest indication of an "agreement." For instance, *Schramm v. Burkhart,* 137 Or 208, 211-12, 2 P2d 14 (1931), stressed identical terms, execution at the same time and place, attestation by the same witnesses, and preparation by the same attorney — circumstances which must exist in most mutual reciprocal will situations — and found a contract on the grounds that the wills "show a clear intention on the part of both testators." *Taylor v. Wait, supra,* stressed that the husband and wife "had knowledge of each other's wills and that the naming of the * * * beneficiaries was the result of their common understanding and purpose." 140 Or at 687. This, too, is probably true of most pairs of mutual reciprocal wills. The *Taylor* court also recited every instance in which either testator had stated to others testamentary intentions, but in only one statement (husband told one witness simply that "he and his wife 'had made an agreement with each other * * *' ") did either indicate that these intentions resulted from any kind of agreement. *Id.* at 689-90. Similarly, in *Stevens v. Myers,* 91 Or 114, 177 P 37 (1919), a contract was found where the only evidence beyond the mutual reciprocal wills themselves was an attorney's testimony that both husband and wife told him that they wanted their property to go equally to their children after the last surviving spouse dies. 91 Or at 126.

And in *Patecky v. Friend et al,* 220 Or 612, 350 P2d 170 (1960), the court found a contract established by nothing more than the wills themselves and statements by the testators reassuring their daughter that she would get all their property after both of them were dead; the only statements relative to agreement were "we have agreed to leave everything to each other, and when we are gone it all goes to you," and "the way we got the will fixed, if I go first then [my wife] gets it and * * * [when both are dead] * * * then it goes to [my daughter]." 220 Or at 618, 623. As recently as 1980, the Court of Appeals in *Woelke v. Calfee,* 45 Or App 459, 608 P2d 606 (1980), found a contract, stressing identical language, simultaneous execution, preparation by the same attorney, and statements by both testators that they had "agreed" or had an "agreement" about the disposition of their property. 45 Or App at 463-64.

■    Were we simply to compare the evidence in those cases with the evidence here, we would be inclined to find that a contract was made. However, the findings that other justices have made while sitting as triers of fact on records unique to the cases before them do not establish rules of law to be applied to our determination of facts upon the record now before us. *Bales v. SAIF,* 294 Or 224, 235, 656 P2d 300 (1982); *Bend Millwork v. Dept. of Rev.,* 285 Or 577, 588, 592 P2d 986 (1979). *See also Reynolds Metals Co. v. Dept. of Rev.,* 299 Or 592, 597, 705 P2d 712 (1985) ("Indeed, in the process of publicly sifting the evidence, we have sometimes expressed as 'holdings' what are really only 'findings,' and this has led to confusion as to what rules of law are laid down in our cases."); *Southern Oregon Broadcasting Co. v. Dept. of Revenue,* 287 Or 35, 42, 597 P2d 795, *cert den* 444 US 932, 100 S Ct 277, 62 L Ed 2d 190 (1979) (*"The lack of comprehensive standards* and methods of assessing different types of property promulgated under ORS 308.205 in advance of the particular assessment *reduces* both *courts from the function of clarifying law to a factfinding function and eliminates any precedential value of a decision* even with respect to the same property of the same taxpayer from one year to the next.") (Emphasis added). Our decision must turn not on whether we can discover in the record language analogous to that of "agreement" upon which previous members of this court have relied in finding the existence of a contract, but on what the record indicates that

Charles, Sr., and Lillian probably understood their agreement to be.

Plaintiff contends, and the Court of Appeals properly held, that if two parties execute wills pursuant to a contract, once the survivor accepts benefits[11] under the other's will, a court of equity may enforce the contract and prevent a "fraud" by the survivor who might dispose of the property inconsistently with the contract; this rule holds, notwithstanding the well-established law in Oregon that every will remains revocable during the testator's lifetime. 70 Or App at 433, citing *Schramm v. Burkhart, supra,* 137 Or at 215; *Taylor v. Wait, supra,* 140 Or at 684-85; *Irwin v. First Nat'l Bank,* 212 Or 534, 541, 321 P2d 299 (1958). Parties contracting to make wills need not also expressly contract not to revoke those wills, to make the contractual disposition of property specifically enforceable.

But there is no "fraud," and no reason for a court of equity to prevent the revocation of a will from having its ordinary effect, unless each testator had reason to know that the agreement would bind him or her in this manner. We may specifically enforce only those aspects of an agreement to make wills which both parties much more probably than not understood to be the consequences of that agreement.

Based on the evidence presented, we do not find it so highly probable that Charles, Sr., and Lillian understood that once either of them took under the other's will, the ultimate disposition of the property stated in the 1959 wills could not be changed. From Martin's testimony, it appears that Charles initially wanted to effect such a result, but Lillian did not. While attorney Biggs' intentions in preparing the wills are not decisive, his views about irrevocable wills are relevant, to the extent he communicated them to Mr. and Mrs. Willbanks, in determining what they understood themselves to be doing. *See Gill v. Hewitt,* 244 Or 242, 244, 417 P2d 399 (1966) (finding no contract despite mutual reciprocal wills when attorney testified that he advised against joint will because "I have an aversion to wills of that type" because "it might be construed as irrevocable"); *Holman et al v. Lutz et al,* 132 Or 185, 199,

---

[11] A court should determine whether property actually was taken by the will rather than by operation of law or some other instrument. *See* note 6, *supra.*

211, 282 P 241, 284 P 825 (1930), *overruled on other grounds,* *State ex rel Madden v. Crawford,* 207 Or 76, 91, 295 P2d 174 (1956) (finding no contract where, *inter alia,* attorney did not discuss with testators "any relationship of any kind between the two wills" and did not prepare any writing evidencing the contract).

Were the burden of persuasion reversed, we could not say it is much more probable than not that the testators did *not* understand that each was relinquishing his or her right to change the disposition of property once the benefits of the spouse's will were received; Martin's testimony too incompletely reveals what Biggs told them, and cannot inform us whether, when they returned, they executed their wills in acquiescence to his policy against irrevocable testaments, or in spite of it. Considering Martin's testimony as a whole, it is more likely than not that Biggs told the Willbanks of his policy, but the question is a close one.

We agree with the Court of Appeals that Biggs' advice against "a will that couldn't be broken" could support an inference that the parties merely decided to rely on an oral agreement and not put explicit contractual language in the wills themselves. 70 Or App at 435 n 4. But we find nothing to indicate this is much more probable than the equally reasonable inference that once they learned of his policy, they decided to go along with it. Similarly, by her statement that she would go along with Charles, Sr., Lillian could have meant at least two different things. She could have meant that, in exchange for his agreement to cut Charles, Jr., out of the will, she acquiesced in her husband's desire to treat plaintiff and LaVonne equally, and to make that disposition irrevocable after either Charles, Sr., or Lillian died. But she could also have meant only that she would go along for the time being, contemplating that she might well survive him and change her will after that. Indeed, Lillian, whom the witnesses described as more forceful and dominant than her husband, did change her will to favor LaVonne only two months after her husband's death. Had she thought she had entered into a contract not to do so, this would mean that she was willing to break her promise to her husband in the few short weeks following his death. To us that seems improbable. Plaintiff has not persuaded us that the first interpretation of her remark is the much more likely inference.

■ We hold that a person who seeks specific performance of a contract to make mutual reciprocal wills, allegedly entered into before the effective date of ORS 112.270, must show that it is much more probable than not that the parties to the alleged contract understood that the survivor, after taking property pursuant to the will of the first testator to die, would not be able to affect the disposition of that property by revoking the mutual reciprocal will. Plaintiff has not proven the existence of a specifically enforceable contract by clear and convincing evidence, because we cannot find that it was much more probable than not that Mr. and Mrs. Willbanks manifested the essential mutual assent necessary to the making of a contract. *See Nieminen v. Pitzer,* 281 Or 53, 57, 573 P2d 1227 (1978); *Kabil Development Corp. v. Mignot,* 279 Or 151, 153, 566 P2d 505 (1977).

Because the plaintiff did not establish by clear and convincing evidence the existence of the contract which he sought to enforce specifically, the judgments of the trial court and the Court of Appeals were incorrect, and we need not decide whether the action was barred by the statute of limitations.

Reversed.